CITY OF CHARLESTON *et al. v.* PUBLIC SERVICE COMMISSION

(Nos. 6956 and 6956-A)

Submitted March 3, 1931. Decided March 10, 1931.

246

*Charles Ritchie* and *Philip H. Hill*, for the city of Charleston.

*Paul W. Scott* and *H. L. Ducker*, for the city of Huntington. *Geo. S. Wallace*, for Huntington Manufacturers' Club. *W. T. Lovins*, for city of Kenova, Town of Ceredo and Town of Kenova Chamber of Commerce. *Wm. B. Hogg*, for City of Williamson. *B. Randolph Bias*, for Williamson Chamber of Commerce. *Claude A. Joyce*, for City of Logan. *Grover F. Hedges*, for City of Spencer. *J. Luther Wolfe* and *T. J. Sayre*, for Towns of Ravenswood, Sandyville and Silverton. *G. W. Staats* and *Burton Crow*, for Town of Ripley, Petitioners.

*Harold A. Ritz* and *Rummel, Blagg & Stone*, for Respondent United Fuel Gas Company.

HATCHER, JUDGE:

This hearing involves orders entered by the Public Service Commission on August 16th and December 4, 1930. The orders were entered in an investigation by the commission of the rates charged the protestants for gas by United Fuel Gas Company. The result of the investigation is a very substantial increase in the rates. The majority of the commission

(hereinafter referred to as *the commission* for the sake of brevity) fixed the fair value of the utility's property as on December 31, 1928, as follows:

| | |
|---|---:|
| Production system | $15,146,352 |
| Transmission system | 17,793,598 |
| Distribution system | 3,935,193 |
| General property | 951,254 |
| | $37,826,397 |
| Going concern value | 3,171,021 |
| | $40,997,418 |
| Leaseholds | 7,914,037 |
| Total | $48,911,455 |

Included in the valuation of the physical property ($37,-826,397) are allowances for general overheads of 20% on the cost of labor and materials in the transmission system and of 17% on such cost in the other three items. The going concern value is "10% of the estimated value of labor and materials in the plant depreciated, and exclusive of land and general overheads." (Statement of commission). The value accorded the leaseholds is their "adjusted" book value. The commission estimated that $12,200,000 (of the $48,911,455) was the value of the utility's property appropriated to the use of consumers within the state. On the property so appropriated $109,800 was allowed for depreciation, and $506,-300 for amortization. Tariff rates for consumers were then approved, which after furnishing enough revenue to pay operating expenses, including taxes, should also provide the allowances for depreciation and amortization and a net return of 8% to the utility.

The duty imposed upon the commission in cases such as this is that it shall "enter such orders as may be just and lawful." Code 1923, chapter 15-O, section 2. A like charge is given to this Court upon appeal, as the statutory injunction to us differs only in words: "The court shall decide the matter in controversy as may seem to be just and right." Code, *supra,* section 17. Despite the obvious legislative invi-

tation to us to become a fact finding body, we have persistently held that because the commission is "experienced in rates and familiar with the intricacies of rate making" we will ordinarily not substitute our judgment for that of the commission on controverted evidence. *Town* v. *Gas Co.*, 103 W. Va. 526, 529. Our position was clearly stated in *Gas Co.* v. *Commission*, 101 W. Va. 63: "An order of the Public Service Commission fixing rates to be charged by a public service utility, within the constitutional and legislative power of the commission, will not be disturbed unless it appears that the finding of fact on which the order is based is contrary to evidence, or without evidence, or there has been mis-application of legal principles; and where there is a substantial conflict of evidence on any question of fact, the probative value accorded by the commission to such evidence will not be disturbed."

The statistician of the commission, Mr. E. V. Williamson, made a thorough investigation of the utility and reported that the original cost of its physical properties was $36,183,-011 (not depreciated). Mr. John Jirgal, an expert accountant, engaged by the protestants, fixed that cost from the books of the utility at $37,916,873 (not depreciated). The opinion of the majority of the commission reflects no consideration whatever of the Williamson and Jirgal reports so far as they deal with this subject. Mr. F. H. Lerch, Jr. (of Ford, Bacon & Davis, engineers) filed a valuation report on behalf of the utility, in which he estimated the cost of reproducing new the physical properties of the utility at $53,972,197, as on December 31, 1928. Of this sum, the estimate for general overhead charges was $9,847,102 and for labor and material, $44,125,095 which was depreciated to $32,-846,125. Mr. Lerch fixed the going value of the utility at $5,397,220 or 10% of his estimated reproduction cost new. Mr. J. Paul Blundon, an experienced engineer, filed a similar report on behalf of the protestants in which he estimated the reproduction cost, new, of the same property at $42,286,-901. Of this estimate $5,188,314 was for general overheads, and $37,098,587 for labor and material which he depreciated to $22,069,430. We find no estimate of going value by Mr.

Blundon, but Mr. Earl L. Carter, an experienced engineer, appearing for protestants, estimated the going value at $4,500,000. The commission (as shown by its opinion) adopted the estimates of Mr. Lerch of the costs of material and labor (without general overheads) requisite to reconstruct new, the physical properties of the utility. The commission also adopted his calculation of depreciation except as to an increase of $854,804 on a certain well equipment account, to meet the decision in the *Clarksburg Light & Heat Company* case, P. U. R. 1928 B 290, 313. Much of the briefs of the contestants is devoted to an attack upon the qualifications and conclusions of Mr. Lerch, and to the support of Mr. Blundon. The utility responds warmly in kind, attacking Mr. Blundon and supporting Mr. Lerch. Both of these gentlemen are evidently competent and of very high standing. The wide divergencies between them may be accounted for on the supposition that, without volition, neither could be entirely "unmindful of his client's interest." *Light Co.* v. *State* (N. H.) 120 Atl. 689. Be that as it may, we would not be so inconsistent with the position stated above as to pass generally on the merits of the Lerch-Blundon controversy. Nor is it necessary to go into details, because it was improper for the commission to base the valuation of the physical properties exclusively upon reconstruction cost, new, less depreciation. " * * * the cost of reproduction, new, less depreciation, is to be accepted merely as an element and not as the standard of value." *City* v. *The Commission,* 101 W. Va. 378, 381. "The cost of reproduction new should not be made the basis of a gas plant rate valuation, although it will be given some weight." *Springfield* v. *Gas & Elec. Co.,* P. U. R. (Illinois) 1916C 281.

The commission seems to have been led into this error partly by the belief that a similar appraisal of this utility's property by Ford, Bacon & Davis "formed the basis for the commission's findings in the 1924 rate case." This belief is not borne out by the opinion in that case. That opinion states expressly that "the use to which this physical property is put, the book cost, the historical cost estimate, the reproduction cost new, less depreciation estimates" were all con-

sidered. See p. 276, 2 P. S. C. of W. Va. And it further appears from that opinion that the estimated historical cost was much closer to the amount fixed by the commission than any other estimate. In *Bluefield Co.* v. *The Commissioner,* 262 U. S. 279, the Supreme Court held: "In estimating the value of the property of a public utility corporation, as a basis for rate regulation, evidence of reproduction costs, less depreciation, must be given consideration." But it was not said in that case or in any other decision of the Supreme Court that evidence of reproduction costs, less depreciation, should be given even controlling much less exclusive weight. The utility's brief cites several cases which do give dominating weight to the reproduction method. But those cases refer to decisions of the Supreme Court which do not support that doctrine. See the analytical discussion thereof by Judge Rosenberry in *Gas & Electric Co.* v. *Commission,* (Wis.) 194 N. W. 846, 851. In the celebrated case of *Smyth* v. *Ames,* 169 U. S. 466, 546-7, decided in 1897, the Supreme Court held that the value of a utility's property should be ascertained as follows: " * * * the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute; and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property." This holding has been the subject of much criticism which is directed at a comparison of the present and original costs of construction. It leads to "wild uncertainties," said Justice Brandeis in one of his strong dissenting opinions. See *S. W. Tel. Co.* v. *Commission,* 262 U. S. 276, 307; *Charleston* v. *Commission,* 95 W. Va. 91, 106-7. The Supreme Court attempted to obviate criticism by this caution: "The cost-of-reproduction method is of service in ascertaining the present value of the plant, when it is reasonably applied and when the cost of reproducing the property may be ascertained with a proper degree of certainty. But it:

does not justify the acceptance of results which depend upon mere conjecture.'' *The Minnesota Rate Case,* 230 U. S. 352, 452. And for thirty-two years, as enumerated by Alfred Evans, Professor of Law, University of Indiana, the Supreme Court has adhered to the rule in *Smyth* v. *Ames,* citing it no less than thirty times. See 16 American Bar Association Journal, 485. As further pointed out by Professor Evans, those who would construe any of these decisions as giving dominant consideration to evidence of reproduction cost, new, less depreciation, ''do violence to the opinion of the court.'' We have found no better analysis of *Smyth* v. *Ames* than that of Mr. George W. Wickersham, special assistant to the Attorney General, in his brief in *O'Fallon R. Co.* v. *U. S.* 279 U. S. 461, 469: ''The decision in that case sets up, not a formula, but a standard of evidence, holding that neither reproduction cost nor original cost is alone a criterion of value, or to be given dominant consideration, but that the rate-making body must take all elements and measures of value into consideration, and analyze and ascribe to each its proper weight in the light of the evidence of the case.'' Entirely concordant with the conclusion of Mr. Wickersham are expressions by this Court in *Huntington* v. *Commission,* 89 W. Va. 703, 722: '' * * * there is no exclusive method for arriving at the value of a public service plant for rate making purposes. Those charged with the duty must take into consideration every element available. There is no reason why a Public Service Commission or other authority seeking to ascertain this fact should not make its inquiry just as broad as the evidence available will permit, just as in arriving at any other fact which is made the subject of judicial or quasi-judical inquiry.'' After characterizing the reproduction-cost-new-less-depreciation method as ''the most unreliable of any of the methods which may be employed,'' the Court further said: ''The cost of producing a plant originally when it can be shown is certainly entitled to consideration. * * * if the actual cost of the plant is shown with certainty, I would give to this evidence peculiar weight.'' We find no warrant in the instant case for ignoring the reports of actual and historical costs and no reason for giving exclusive or even

dominant weight to the evidence of reproduction cost new, less depreciation. The brief of the utility makes the point that "no effort was made by the protestants to relate these original book costs to present-day values." This point is well taken. Without evidence thereon we cannot now decide this controversy, and the case must be recommitted to the commission for evidence on that point.

## GOING CONCERN VALUE

It is the settled rule that going concern value is an element to be considered in arriving at the fair value of utility property. This rule had its inception in the decision of Justice Brewer, while circuit judge, in the case of *Water Works Co.* v. *Kansas City*, 62 Fed. 853, 865. The water company was seeking to enforce a contract against the city for the purchase of a water works system. The city contended that the value of the water works plant was the value of the pipe, machinery and real estate as put together in a complete system, irrespective of whatever the property was earning or might earn in the future. Justice Brewer held, however, that in addition to the costs of the completed property, the system had a value as an established business which was in fact earning an income—a business secured through the efforts made and the inducements offered by the company. Following that pronouncement, going concern value was defined in *Gas Co.* v. *Des Moines*, 238 U. S. 165, as "the value of an assembled and established plant doing business and earning money over one not thus advanced." Unfortunately the definition appended no measure of this value in case of a monopolistic utility. Commissions generally have proposed no definite measure. They regard the mandate relating to this value "just court made law," as was stated by Commissioner Pooley of the New York Public Service Commission. They treat it as compulsory, and are impatient with the concept because they cannot intelligently apply it. This has resulted in allowances which were, for the most part, purely arbitrary. One court said that these allowances varied between 7.5% and 27.9% of the cost of reproduction. *Gas and Electric*

*Co.* v. *Commission,* 10 Fed. (2d) 252, 255. It is evident that many of these percentages can have no economic significance. The percentage basis for fixing going value is opposed by the best considered cases. See decisions cited in *Telephone Co.* v. *Commission,* 102 W. Va. 296, 300, 301. Reams have been written by commissions and courts attempting to illustrate the above definition. We have found no discussion which is specially enlightening. In fact, does the definition need illumination? It is clear that a purchaser seeking an income will pay more for a going concern, than for one not established. It is equally clear that the Supreme Court never intended to compel commissions to add to the base rate a purely speculative percentage, under the guise of "going value." Mathematical exactness may not be possible, but that does not warrant resorting to conventional percentages. "Each case must be controlled by its own circumstances," said the court in *Gas Co.* v. *Des Moines, supra.* This expression contemplates that commissions will exercise independent judgment in each case, and will not make an allowance for going value, unless justified. "Whether going concern value should be considered in determining the base for fixing the rates of a public service corporation depends on the financial history of the corporation." *Houston* v. *S. W. Bell Tel. Co.,* 259 U. S. 318. The rate heretofore charged by the instant utility has been so attractive to the public, that it is not conceivable that any appreciable effort was requisite to secure patrons. This thought was emphasized in conference by JUDGE MAXWELL, who said: "Where a natural gas company is without competition from any other gas company and its product is in no real sense placed in competition with any other fuel, the burden of building up patronage is negligible. In such circumstances, and under conditions existing in the instant utility's regulated field of service with reference to available fuels, the only practical requirements for the acquisition and retention of its patronage have been reasonable rates and efficient service. There would seem to be very narrow basis of justification for going concern value in this case." When, however, a utility has paid the cost of attaching its business, and perfecting its operating organiza-

254

tion, that cost, translated into an item of value, should be made a part of the rate base. If the public has paid for that cost through operating expenses, the cost should not be capitalized. 2 Wilcox Whitten Valuation of P. S. C. p. 1366. We are of opinion that the utility assumes the burden of demonstrating to the commission upon direct evidence when possible, a reasonable groundwork of facts from which going value can be determined. *Telephone Co.* v. *Commission, supra,* p. 304; *Spring Valley* v. *City,* 192 Fed. 137, 167. It should show advertisement and solicitation for business, education and service of the public, an efficient operating organization, and any other fact, from which going value may arise. The opinions of experts, when without foundation of fact, are entitled to little consideration. *Telephone Co.* v. *Commission, supra,* p. 304. As the percentage fixed for going value by the commission is not substantially supported by the evidence, we set it aside and advise the commission to take this item under consideration again, in the light of our observations on the subject.

## GENERAL OVERHEADS

Expenditures for overhead costs, not charged to operating expenses, should be included in the rate base. *Gas Co.* v. *Commission,* 95 W. Va. 557, 574. The commission seems to have been primarily influenced in determining the percentages for this item by the estimates of experts. These estimates are based upon a hypothetical construction of the utility's property under conditions so entirely dissimilar to the conditions under which the property was actually constructed, that the estimates have little if any probative weight. We would not have the commission entirely disregard the estimates, but there is evidence of the actual cost of overheads, in some of the construction of the utility. This work was done under the highly trained and efficient organization of the utility. The cost was accurately kept and the ratio it bears to the costs of material and labor is much lower than the conjectural ratios of the experts. Consequently we disapprove the percentages allowed by the commission for this

item, and recommend consideration of the evidence of the actual as well as the evidence of the theoretical costs. See generally *Springfield* v. *Gas & El. Co.*, P. U. R. 1916 C 281, 337 and 342.

## LEASEHOLDS

The utility offered evidence of a market value of its leaseholds of approximately $50,000,000 which was disregarded entirely by the commission. This was error. *Charleston* v. *Commission,* 95 W. Va. 91; 1 Whitten, *supra,* secs. 213 and 521-5, inc. That value was placed on the leaseholds by witnesses who had in mind chiefly an unregulated use of the gas. However, the leaseholds are subject to the requirements of the public. This subjection constitutes a "genuine encumbrance" (Dr. Gray, Economist) which conceivably might impede the sale of the leaseholds on the open market. See opinion of Mr. Justice Stone in *United Gas Co.* v. *Commission,* 278 U. S. 300, 317. The witnesses did not take into consideration the far-reaching effect of this encumbrance, but for rate making purposes the encumbrance must be considered. In ascertaining such value, the commission is not restricted by artificial rules, or formulas, but must consider all relevant facts. *The Minnesota Rate Cases, supra,* p. 434. Therefore, in weighing the testimony of witnesses on this subject, the commission will give consideration also to the following items: (a) the delay rentals on the leaseholds paid by the public as operating expenses (*Gas Co.* v. *Commission,* 95 W. Va. 558); (b) the protection of the utility from competition within its field; (c) the assurance to the utility of a fair return; and (d) the right extended the utility to exercise eminent domain. This right was primarily conferred by the public on the utility as an incident to its service of the public. In the exercise of the right, however, the utility has also served itself. The construction of gas mains to the state lines was accomplished through the exercise of the right. About cne-fourth of the gas which the utility produces is consumed by the protestants; the remaining three-fourths is transported without the state, and sold at a very attractive profit. The present high value of the leaseholds is attributable to this

profit. Without eminent domain it would seem that the expense of procuring rights of way for the utility's pipe lines would have been greatly increased if not prohibitive. Without pipe lines this gas would have no interstate markets. So the privilege of exercising eminent domain has been a dominant factor in enhancing the value of the leaseholds. That high privilege must now also be considered in favor of the public, against the utility, lest this creation of the public, the utility, become another Frankenstein. Mr. Justice Stone had this same thought in mind when he referred to "the obvious necessity" of this utility and associates securing "special privileges to enable them to distribute their product to consumers" in Pittsburg. *United Gas Co.* v. *Commission, supra.* We find further support for these views in Groninger on Public Utility Rate Making, p. 47; "Thus is privately owned property devoted to public use safe-guarded, protected, benefited and privileged as privately owned, privately used property, is not. These safeguards and benefits, coming to public service property under regulatory laws, are of value and should be compensated for by a reasonable appraisement of such property when considered for rate-making purposes." See also 1 Whitten, *supra,* sec. 283.

## NET RETURN

In fixing the rate of net return at 8% the commission was largely influenced by its impression that this percent was required by the Supreme Court. The impression is erroneous. In a number of cases 8% has been fixed or approved by the Supreme Court, but it has insisted that the percent was not arbitrary, and depended entirely upon the circumstances of each case. "There is no particular rate of compensation which must in all cases and in all parts of the country, be regarded as sufficient for capital invested in business enterprises. Such compensation must depend greatly upon circumstances and locality." *Willcox* v. *Gas Co.,* 212 U. S. 19, 48. What is a fair net return must be tested primarily by present economic conditions. This period of financial stress and business depression calls for a conservative allowance; but the return

should be ample to assure confidence in the financial soundness of the utility. The return should ordinarily provide a sufficient amount to pay reasonable dividends and to pass something to the surplus account. *United Railways* v. *West,* 280 U. S. 234; *Bluefield Co.* v. *Commission,* 262 U. S. 679, 692-3. It was contended that the instant utility already has an ample reserve fund. If the commission should find this true, it is questionable whether the Supreme Court would demand that the fund be further augmented at the present time. See generally *Telephone Co.* v. *Commission, supra,* p. 303. We refer again this rate to the commission with instructions to exercise its untrammeled discretion in the matter, in the light of this discussion.

It was stated in argument by counsel for the utility that the cost of well equipment was fixed at 46% of the original cost, no matter whether the wells were new or old. We suggest that the commission review again the evidence as to the wells; and unless there is a sufficient number of old wells to offset the new wells, then the value of the equipment be adjusted in some more uniform manner.

Some dissatisfaction was expressed as to the depreciation and amortization fixed by the commission. These matters depend largely upon the experience of the commission as well as upon the evidence of witnesses, and we cannot say that the commission has abused its discretion thereon. *Telephone Co.* v. *Commission, supra,* p. 302.

Complaint is made that the estimate of Mr. Lerch included property which was of no present or potential service to the public. If this complaint be well founded, the value given such property should, of course, be disregarded. *City* v. *Fashay Co.,* 110 Kan. 409.

The orders in this case entered by the commission on August 16th and December 4, 1930, respectively, are set aside, and the case remanded.

*Orders set aside; remanded.*

Since writing this opinion I have given further study to the case of *Board etc.* v. *Telephone Co.,* 271 U. S. 23, 32, wherein it is said: "Customers pay for service not for the

property used to render it. Their payments are not contributions to depreciation or other operating expenses or to capital of the company. By paying bills for service they do not acquire any interest, legal or equitable, in the property used for their convenience or in the funds of the company. Property paid for out of moneys received for service belongs to the company just as does that purchased out of proceeds of its bonds and stock." Under that holding, I am very doubtful of the right of the commission to consider the delay rentals charged by the utility to and paid by the public on the question of market value of the leaseholds, except merely as supporting the right of the public to subject the leaseholds to its needs. My brethren, however, still have faith in the pronouncement of this Court thereon in *Gas Co.* v. *Commission,* 95 W. Va. 558.