THE CITY OF WHEELING *v.* THE NATURAL GAS COMPANY OF WEST VIRGINIA

(No. 7849)

Submitted April 11, 1934.   Decided June 5, 1934.

150

P. J. *McGinley, Carl O. Schmidt* and *Frank A. O'Brien,* for appellant.

*David E. Mitchell, Harold A. Ritz* and *Rummel, Blagg & Stone,* for appellee.

WOODS, PRESIDENT:

The City of Wheeling appeals from an order of the Public Service Commission, entered May 25, 1933, dismissing its complaint, filed August 14, 1931, wherein the rates imposed by the Natural Gas Company of West Virginia, under Tariff No. 6, were attacked as unjust, unreasonable, extortionate and unlawful.

The commission's action in upholding the rates established by the foregoing tariff was based upon certain findings, made as of December 31, 1931.

## SUMMARY OF FINDINGS

In relation to the fair value of the utility's property, the commission found as to valuation for the entire company and for public service in West Virginia:

|  | Entire Company | West Virginia |
|---|---|---|
| Physical | $7,467,701 | $3,685,390 |
| (reproduction new, less depreciation) | | |
| Undistributed construction costs | 952,681 | 471,335 |
| (reproduction new, less depreciation) | | |
| Organization | 22,000 | 10,998 |
| Going Value | 514,235 | 253,775 |
| Leaseholds | 640,260 | 324,676 |
| Total | $9,596,877 | $4,746,174 |

To the West Virginia allotment was added $143,114, as working capital, making $4,889,288 as the fair value of the property and capital so used by the public. And after deducting $185,769 for meters and service lines purchased by consumers prior to 1915, the commission arrived at the figure $4,703,519 as a net rate base on which to calculate the net earnings of the utility.

In addition to the foregoing, the commission found (1) that the gross revenue of the company for its public service business in West Virginia for the year 1931, was $1,030,610; (2) that the cost to the company in rendering the service, including allowance of $98,386 for retirements and replacements (depreciation of physical plant) and $66,503 for amortization, was $807,469; and (3) that the net earnings ($223,141) available for return to the defendant company, being at the rate of $4\frac{3}{4}\%$ of the rate base, are not unfair to the West Virginia consumers. It did not fix a fair rate of return, but indicated in its opinion that $6\frac{1}{2}\%$ was not unreasonable.

## THE RECORD

The commission had before it, in addition to a great mass of testimony taken during the hearing, reports by Mr. Williamson, its statistician, and by Mr. Jirgal, of

Arthur Andersen & Company, an accounting firm employed by the company, based upon examination of the company's books and accounts, and also an inventory and appraisal on behalf of the company by Ford, Bacon & Davis, engineers, with Mr. F. H. Lerch, Jr., in charge of the work, while Mr. J. Paul Blundon and assistants made and filed a valuation report for the City of Wheeling.

## History of the Company

The Natural Gas Company, which was organized in 1885, operated as an independent company until 1925, when it was taken over by the Ohio Fuel Corporation, a subsidiary of the Columbia Gas & Electric Corporation. Throughout its existence it has been financed from earnings, with the exception of $601,123.68 cash capital. No bonds have been issued, and, except for temporary financing to pay for large construction jobs or the purchase of other companies, the company has had no occasion to borrow or owe money.

The report of the commission's statistician, based on the books of the company, shows that as of December 31, 1931, there was $2,997,200 capital stock outstanding. $601,123.68 of that amount, as heretofore noted, was issued for cash, all of which, with the exception of $6,200 contributed in 1912, was advanced during the years 1885-1887, inclusive. In 1886, stock in the sum of $399,851.70 was issued in return for certain leaseholds, which proved to be of little value, and all of which have long since been abandoned. In 1912, 1916 and 1920 large stock dividends, totalling $1,933,700, were issued. Over the period 1912 to 1916 stock totalling $57,300 was issued to employees as a bonus. The remainder of the outstanding stock was issued for legal services and interest. In addition to the issuance of stock the company has, up to December 31, 1931, paid to its stockholders $11,889,234.60 in cash dividends. Beginning with 1922, as indicated in the following table the cash dividends have at no time been less than 10 per cent of the outstanding stock:

| | |
|---|---|
| 1922 | $ 449,580 |
| 1923 | 449,580 |
| 1924 | 359,664 |
| 1925 | 299,720 |
| 1926 | 299,720 |
| 1927 | 299,720 |
| 1928 | 449,580 |
| 1929 | 1,438,656 |
| 1930 | 479,552 |
| 1931 | 419,608 |

At the end of the year 1931 the company had, according to the book accounts, a corporate surplus of $2,532,556.-17, and a depreciation reserve of $1,350,789.25.

The company has been engaged in the natural gas business since its organization. Up to 1913, its rates were fixed by the city council—the company appearing before the council at different times with statements supporting their reasons for adjustments in rates. In 1920 the commission permitted it to file its tariff No. 4 of 40c for domestic service, with discount of 2c for prompt payment, and in 1922 the company asked for authority to increase rates on "a step-up" basis, ranging from 45 to 60c. After a hearing, the commission, December 10, 1923, denied the increase, from which order the company appealed. On February 26, 1924, this Court reversed the commission and remanded the case for further investigation. *Natural Gas Co.* v. *Public Service Commission*, 95 W. Va. 557, 121 S. E. 716. Thereafter (June 26, 1924), the company and all the protestants, including the City of Wheeling, filed with the commission a stipulation providing for dismissal of the proceeding and agreeing that the company should be authorized to file a tariff putting into effect a rate of 52c per thousand cubic feet for domestic service, etc., "said rates to be effective from the meter readings beginning about the 15th day of June, 1924, until the meter readings beginning about the 15th day of December, 1927." This being approved, the company was permitted to file its tariff No. 5, putting the agreed rate into effect. In 1929 the commission requested

the filing of a new tariff, and after some correspondence, the company on June 27, 1930, submitted its No. 6, which is identical with No. 5. The domestic consumers since 1924, have been paying, and are still paying, 52c less the 2c discount.

## CASE ON APPEAL

The city urges eighteen separate points of error, all of which, according to its contention, involve matters of law. The company, however, insists that such assignments relate to matters of fact, and that the commission's findings thereon will not be disturbed on appeal.

The duty attempted to be cast upon this Court by the statute (Code 1931, 24-5-1) is that it "shall decide the matter in controversy as may seem to be just and right". But, as pointed out in *United Fuel Gas Co.* v. *Commission*, 73 W. Va. 571, 80 S. E. 931, our jurisdiction is limited to matters purely judicial. And, although our judgment will not ordinarily be substituted for that of the commission, because of the latter's experience in rates and familiarity with the intricacies of rate making (*Harrisville* v. *Commission*, 103 W. Va. 526, 138 S. E. 99), where it appears that its findings of fact are contrary to the evidence or without evidence, or there has been misapplication of legal principles, it becomes our bounden duty as a matter of law to set aside the same and remand the case for further consideration in conformity with law. *Pittsburgh & West Virginia Gas Co.* v. *Commission*, 101 W. Va. 63, 132 S. E. 497.

## PRESENT FAIR VALUE

It is the contention of the city that no substantial weight was given to the original cost, in ascertaining the present fair value of the company's physical property, exclusive of leaseholds.

At the outset the commission made reference to the fact that "the present as compared with original costs of construction are, among other things, a matter for

consideration" (*Smyth* v. *Ames,* 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819.) ; that "it is impossible to ascertain what will amount to a fair rate on property devoted to public service without giving consideration to the cost of labor, supplies, etc., at the time the investigation is made" (*Missouri ex rel. Southwestern Bell Telephone Company* v. *Public Service Commission,* 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807.) ; and makes the observation that "in view of the changed economic level which affects values today, the replacement cost theory of valuation of utility property is a valuable safeguard of the consumer's interests."

It found that the reproduction cost new of the company's physical property was not less than $9,100,897. Lerch, for the company, estimated such cost at $9,468,016, and Blundon, for the city, at $8,766,362. The commission's statistician found the book cost of the physical property to be $8,383,092, while Jirgal, the accountant for the company, after making certain adjustments, found the physical property, as represented by the company's books, to be $8,547,769, which when translated by him into 1931 dollars amounted to $10,726,685. We have been able to find no precedent giving to such a translation any particular evidentiary value. It is, in our opinion, nothing more than just another estimate of reproduction cost new. A translation into 1931 *values* would be an entirely different matter. While the commission made mention of the various factors presented for consideration, it appears from a comparison by accounts (47 in all) of the reproduction cost estimates of Lerch and Blundon, and the original cost reports of Jirgal and Williamson, that it adopted the actual estimate of either the city's or company's expert in all accounts but five, namely, No. 313 Production Field Lines, No. 324 Transmission Line Equipment, No. 333 Distribution Line Equipment, No. 334 Services, and No. 322 Compressor Station Equipment. In regard to the first three, which according to the commission's finding total $4,935,278, it took Blundon's wages for labor and Ford, Bacon & Davis' labor performance. A like procedure was invoked in regard to the

Services account. In regard to the Compressor Station Equipment account, it stated: "The company's engineers estimate it will cost $299,978 to replace the equipment at these stations; the city's engineer estimates the cost at $273,759; the cost as reported by the company's accountant, at the time the stations were equipped, was $287,377.92, which cost compares favorably with the report of the commission's accountant. More than 50 per cent of the equipment in these stations has been installed in the past fifteen years, and the greater part of the rest in the year 1911. Giving consideration to the difference in labor costs used by the engineers and having in mind the actual cost of the equipment in these stations as shown by the company's books, it is considered that as of December 31, 1931, it would cost not less than the book cost of this equipment to reproduce it. Therefore, the commission finds that cost to be $287,378." It is interesting to note that such finding was within $500 of the average of the experts' estimates.

It occurs to us that the reason for accepting the actual cost in reference to the compressor station equipment might apply with equal weight to the other items of property. It appears from the record that approximately 66 per cent of the costs of the property now in service was incurred between the years 1913 to 1931, inclusive.

From an examination of the several findings dealing with the present fair value of the property, undepreciated, it is quite apparent that the commission practically ignored the actual cost.

In dealing with the accounts included under undistributed construction expenditures, or overheads, Blundon's estimates, totalling $1,161,805, were adopted in toto, as against Lerch's estimate of $1,242,962. According to Williamson's report it appeared that only $112,543 had been actually charged to overheads. Jirgal, however, in his adjustment of the books, found that, under proper accounting practices, $915,527.92 should have been so charged.

Another important phase on the element of values is the fact that early in 1925 the company was taken over

by the Ohio Fuel Corporation on an exchange of stock, the value of the stock given in exchange by the latter being worth on the market approximately $6,000,000. In support of such value it appears that on December 31, 1931, there was upwards of that amount of property (actual cost) still in existence which had been added prior to such transfer.

This Court, since its decision in *Huntington* v. *Public Service Commission*, 89 W. Va. 703, 110 S. E. 192, down to the present, has repeatedly expressed the view that experts' testimony on reproduction new, etc., is at best most unsatisfactory, and that at least some consideration should be given original cost, where the conditions justify it. The Court, speaking through Judge Hatcher, in *Charleston* v. *Public Service Commission*, 110 W. Va. 254, 159 S. E. 38, calls attention to the fact that the United States Supreme Court in reversing this court in *Bluefield Water Works and Improvement Company* v. *Public Service Commission*, 263 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176, did not say that evidence of reproduction costs, less depreciation, should be given even controlling, much less exclusive weight. And that statement is amply supported by the recent opinion of Mr. Chief Justice Hughes in *Los Angeles Gas & Elec. Corp.* v. *Railroad Commission of California*, 289 U. S. 287, 53 S. Ct. 637, 77 L. Ed. 1180.

We, therefore, direct that the commission review its finding on present fair value, giving due regard to the original cost of the property. And, at this juncture, suggest that the enhanced values at which the purchases of other gas properties have been entered upon the books of the utility be carefully scrutinized.

## LOW LABOR PERFORMANCE

It is stated in the opinion that the reproduction cost new of the physical property, to-wit, $9,100,897, was based on the lowest price levels for labor and materials available in the record. Such statement is in error in view of the fact that the commission, in arriving at the reproduction cost new of the production, transmission

and distribution accounts, accepted Lerch's estimate of 4½ cubic yards as the amount of earth one man could remove in a ten-hour day in preference to Blundon's estimate of 6 cubic yards. This action accounts for the $4,-935,278, heretofore referred to, which was $208,393 in excess of Blundon's estimate on said accounts and $250,-442 less than that submitted on behalf of the company. We are of opinion that the commission was not warranted in adopting Lerch's low estimate, in view of the record, and, therefore, direct that such finding be revised.

### CONSUMERS' CONTRIBUTIONS TO CAPITAL

The city claims that the commission has erroneously included in the fair value of the property for rate making purposes certain capital items theretofore charged to and paid as operating expenses, thus requiring the consumer to pay an income to the utility upon the property so furnished. In support of its contention that such contributions should be excluded, the city relies chiefly upon *Natural Gas Company* v. *Public Service Commission, supra,* and *Charleston* v. *Public Service Commission, supra.* To like effect: *General Water Supply Company,* P. U. R. 1923B, 802, where the New Jersey Board of Public Utility Commissioners eliminated main and extension pipes installed at the expense of the consumer; *Kerman Telephone Co.,* P. U. R. 1922A, 853; *Southern California, Edison Co.,* P. U. R. 1924C, 1; *Tonapah Sewer & Drainage Co.,* P. U. R. 1924A, 837; *Arkansas Water Co.* v. *City of Little Rock,* P. U. R. 1924C, 73; *Gernet* v. *Myerstown Water Co.,* P. U. R. 1925B, 290, (Pa.); *Buffalo Gas Co.* v. *City of Buffalo,* 3 P. S. C. (2nd D. N. Y.) 553.

Although the books of the company, according to Jirgal's adjusted account, show $915,527.92 to have been actually expended for undistributed construction costs, or overheads, only $112,543 of such amount was carried as a capital item—the remainder being charged to operating expense. And, up to 1920, such capital items as the

construction of compressor stations, the drilling of wells and, to a minor extent, the construction of certain transmission lines, and meter installations, amounting, according to Jirgal's report, to $889,518.16, were charged to operating expenses.

The commission's action in relation to the above was based on *Board etc.* v. *New York Telephone Co.*, 271 U. S. 23, 46 S. Ct. 363, 70 L. Ed. 808, which, according to the contention of the gas company, is authority for the proposition that earnings of former years cannot be used to diminish the value of existing property. An examination of that case shows that the board of commissioners had directed the company to make up current losses out of reserves accumulated in the past. No question was raised there in regard to including property in the rate base which had theretofore been paid for out of operating expenses.

In *Charleston* v. *Public Service Commission, supra,* this Court, upon authority of *Natural Gas Company* v. *Public Service Commission,* held that the commission had the right to consider the delay rentals charged by the utility to and paid by the public on the question of market value of leaseholds, the *New York Telephone Company* case notwithstanding.

In *Los Angeles Gas & Elec. Corp.* v. *Railroad Comm. of California,* 58 Fed. (2d) 256, 267, the court in dealing with a somewhat analogous question in regard to overheads, and with due regard to the *New York Telephone* case, said, among other things: "It is clear, we think, that in considering the historic cost of the plant the company cannot include therein elements of value which have been apportioned to general expense and paid from the current revenues as an expense of operation. * * * The company in the case at bar is seeking the aid of a court of equity to exact from the consumers a larger amount than has been accorded to them by the commission. Should equity aid the company to again exact from the consumers income upon a sum which they have already paid to them, not as capital, but as income? We are not without authority upon this exact question. It has been

held that this cannot be done. *Natural Gas Co.* v. *Public Service Comm.*, 95 W. Va. 557, 121 S. E. 716." The Supreme Court of the United States, in affirming the foregoing case (289 U. S. 287, 53 S. Ct. 637, 77 L. Ed. 1180), did not deal with this point.

In the instant case, as already indicated, the overheads and the items of physical property now sought to be capitalized were charged to operating expenses, and the rates apparently fixed on that basis. For the company now, by virtue of a change in accounting, to attempt to capitalize such items, is certainly not just or proper, under our decisions.

There is no difference in principle, in our opinion, in permitting the deduction of the foregoing items and that allowed by the commission for meters and service connections paid for by consumers prior to 1915 (See "Summary of Findings", *supra*). Its action, as indicated in its opinion, was based on the ground that the relation of such property to the rate base is similar to that of the consumer's range or heater.

We therefore advise the commission to take these items under consideration again.

### Capital Added by Virtue of Tariff No. 5

The city makes the further contention that it is entitled to a deduction from the present value of all properties added to the company's plant out of the increased revenue made possible by the agreement of 1924 between the city and the company, wherein the city (then suffering from an inadequate supply of gas) agreed to a 52c rate for a period of three years in lieu of the existing 40c rate, and in consideration of the company's agreement, among other things, to dismiss the proceeding for a "step-up" rate of 45 to 60c for gas for domestic use. By virtue of such agreement the revenues of the company for the period were increased by approximately $750,000, of which $591,000, according to the city, went into plant extensions. We are of opinion that the foregoing position is not well taken. The agreement, for all intents and

purposes, amounted to a lawful rate during its existence, and any additions made possible thereby belong to the company. *Board etc.* v. *New York Telephone Company, supra.*

## DEPRECIATION

The commission in dealing with the item of accrued depreciation calls attention to the wide difference between the engineers for the utility and the city—the former finding the entire property to be in 82.6 per cent condition, the latter 65.3 per cent—and then proceeds to adopt the several estimates of accrued depreciation submitted by the engineers for the company for all of the pipe lines, compressor station equipment, services, regulator and meter accounts.

The city points out that the estimates of such experts for the company as Eriksen (internal combustion engines), Nestor (compressors) and Alstadt (meters) were limited to the physical condition of the compressor station equipment, meters, etc., and that the commission in accepting such estimates totally ignored such elements of accrued depreciation as deterioration due to age, obsolescence, inadequacy, physical change, supersession, development of the art and change in the requirements of the public.

The controlling question, according to the decisions, is what is their present value, not whether or not the items are in good physical condition—although the latter is an essential element of accrued depreciation. *Minneapolis* v. *Rand,* 285 Fed. 818; *Idaho Power Co.* v. *Thompson,* 19 Fed. (2d) 547, 565; *Chesapeake & Potomac Tel. Co.* v. *Whitman,* (D. C.) 3 Fed. (2d) 938.

The commission can, and, under the authorities, must give consideration to the various elements going to the question of accrued depreciation. Its finding in this regard must therefore be re-considered.

## DEPRECIATION OF GAS WELLS

The commission, in ascertaining the depreciated condi-

tion of the gas well account, which includes the total cost of both the construction and the equipment of the 399 producing wells, abandoned the generally recognized "rock pressure" method. It accepted Lerch's estimate of 82.9% condition, which was based on an inspection, at the place of stacking, of the materials taken from 9 of the 21 wells abandoned by the utility during 1931. Such procedure is based on the assumption that the well (exclusive of equipment) is comparable to the ditch in which the company's production, transmission and distribution lines are laid. The city, however, introduced evidence showing the average decrease in rock pressure, asserting that a well's condition at the date of appraisal should be based upon the portion of its total function yet to be performed, i. e., the amount of gas it will yet produce as compared with its total production, past and future. Blundon, in arriving at his estimate that the account was in 57.16% condition, considered the rock pressure, in conjunction with the depth of the wells, and added $300 per well as the salvage value of the equipment. While the latter witness' estimate of the value of the account undepreciated was only $31,714 under that of Lerch, in the depreciation of the same the difference between the witnesses was increased to $551,702.

It occurs to us that in view of the fact that the average life of a well, according to the record, is six years, and the further fact that a great deal of the tubing, etc., is left in the well when abandoned, the inspection method does not in itself properly reflect the actual depreciation. It is also questionable whether the equipment from the nine wells, without some further history, would reflect the average condition of the gas well equipment then in use.

In view of the prevailing practice in respect to such matters, and the recent approval of the "rock pressure" method by the Supreme Court of the United States (*Dayton Power & Light Company* v. *Public Utilities Comm. of Ohio*, 54 S. Ct. 647, decided April 30, 1934), we are of opinion that the commission was in error in not giving consideration to the rock pressure method of

measuring accrued depreciation of the wells and equipment.

## LEASEHOLDS

A number of questions are raised in reference to the value placed on the leaseholds held by the utility.

The investment cost of leaseholds is a proper item to be considerd in arriving at fair value of property for rate making purposes. And this Court has held that a gas utility is entitled to include any appreciation in value over such investment cost, if the same is properly shown. *Charleston* v. *Public Service Commission, supra; Natural Gas Company* v. *Public Service Commission, supra.*

The leaseholds, for the purpose of valuation, were divided roughly into four classes, namely, No. 1, actually operated gas territory; No. 2, proven territory; No. 3, acreage located favorable to proven and developed area, but not drilled; and No. 4, acreage located in gas producing belt further removed from present development. The company in order to establish the so-called "market value", referred to in the two last-cited decisions, introduced the testimony of three gas men, Kelly, Webber and Wittmer, the latter placing the market value of all leaseholds (classes 1, 2, 3 and 4), exclusive of estimated value of wells and well equipment, at $2,649,000. Kelly's estimate, however, was $1,956,164, and Webber's $2,528,000. The commission found the present appreciated value to be $1,422,537, from which it deducted the sum of $783,277, the rentals paid over the years on the above acreage, leaving $640,260 to be included in the rate base.

The city contends that the witnesses did not point out and define the character of the "market" wherein the leases would have a value, as estimated by them, and also that only class No. 1 acreage should have been included in the finding. In regard to the former it suffices to say that the evidence is not of that convincing character as is necessarily required under the rules laid down in the decisions. *Charleston* v. *Public Service Commission, supra; Natural Gas Company* v. *Public Service Commis-*

*sion, supra; Dayton Power & Light Company* v. *Public Utilities Comm. of Ohio, supra.* In these days of overproduction in the gas fields, such evidence, at most highly speculative, should be of the strongest possible character; otherwise the safeguards set up by the courts would become meaningless.

As to the right of the company to include in the rate base classes Nos. 2, 3, and 4, the recent opinion of the Supreme Court of the United States in the case of *Columbus Gas & Fuel Co.* v. *Public Utilities Comm. of Ohio,* 54 S. Ct. 763, (decided May 21, 1934) is timely. Mr. Justice Cardozo, speaking for the Court, says: "There will be no need in the computation of the rate base to include the market or the book value of fields not presently in use, unless the time for using them is so near that they may be said, at least by analogy, to have the quality of working capital. The arrival of that time cannot be known in advance through the application of a formula, but within the margin of a fair discretion must be determined for every producer by the triers of the facts in the light of all the circumstances. The burden is on the gas company to supply whatever testimony may be necessary to enable court or board to make the requisite division. Leases bought with income, the proceeds of the sale of gas, and thus paid for in last analysis through the contributions of consumers, ought not in fairness to be capitalized until present or imminent need for use as sources of supply shall have brought them into the base upon which profits must be earned. To capitalize them sooner is to build the rate structure of the business upon assets held in idleness to abide the uses of the future." The commission, in the instant case, was in error in including all the leaseholds of the company in its valuation.

The city further insists that if a value is to be given to the leaseholds greater than their investment cost, there should be deducted from the amount over and above the original cost, not only the delay rentals on the particular leases that the company now has, but the delay rentals on all the leases that have been surrendered in the past, and all expenditures for dry holes, on the theory that such

expense was incident to the development of, and in a measure contributed to the value of, the company's present leaseholds. We are of opinion that such items of expense are comparable to charges for maintenance and replacement of physical properties, and therefore not deductible from the appreciable value of the current leaseholds, where such a value is established.

### GOING CONCERN VALUE

It is contended that there is no evidence to support the additional charge of $512,235 to the rate base as going concern value.

While the authorities all recognize that there is an intangible element of value over and above the aggregate of the value of the separate pieces of property of a utility, our Court, in *Charleston* v. *Public Service Commission, supra,* held that whether going concern value should be allowed in determining a rate base depends upon the circumstances. "Going value is not something to be read into every balance sheet as a perfunctory addition." *Dayton Power & Light Company* v. *Public Utilities Comm. of Ohio, supra.* And it is quite evident that a great many factors must be taken into consideration in arriving at a proper conclusion in a given case. *McCardle* v. *Indianapolis Water Company,* 272 U. S. 400, 413, 47 S. Ct. 144, 71 L. Ed. 316; *Los Angeles Gas & Elec. Corp.* v. *Railroad Comm. of California,* 289 U. S. 287, 53 S. Ct. 637, 77 L. Ed. 1180. The commission found in the gas company an exact parallel to the water company in the *McCardle* case. However, as we view the record the elements found in the latter are lacking here. The gas company's earnings were not acquired by the exaction of low rates; much of its property has been contributed by its patrons through operating expense; its patrons are paying yearly for management and engineering performed under contracts with the Columbia Engineering and Management Corporation, a subsidiary of the Columbia System; and the business of the company is actually falling off. In the absence of a proper con-

sideration of the original cost of the property, we cannot agree that because the estimates of Blundon were accepted in certain instances, the valuation of the physical property was cut to the bone, thus making it mandatory that some provision should be made for value as a living organism.

As heretofore referred to, the company in 1924 was unable to furnish gas to its patrons, and the latter in order to facilitate the purchase of gas from other companies entered into the agreement whereby Tariff No. 5 was permitted to be filed and the former application of the company dismissed.

The burden, under the authorities, is on the utility to show going concern value of its plant. It has not carried the burden, and we therefore disapprove the finding. *Columbus Gas & Fuel Co.* v. *Public Utilities Comm. of Ohio, supra; Dayton Power & Light Company* v. *Public Utilities Comm. of Ohio, supra.*

### ALLOCATION OF PROPERTY

The gas sales method of allocation adopted by the commission apportions 50.71% of the production, transmission, and general property to the consumers in this state, thus wholly ignoring where the gas is sold or how much property is necessary to produce and transport that gas to market.

A cursory examination of the operations map of the company's properties (which includes a portion of the panhandle in the vicinity of Wheeling, a large acreage in Ohio to the west and north, and an acreage in Pennsylvania to the east), together with evidence that very little gas is being transported into this state from Ohio, shows that the greater part of the production and transmission system in Ohio is devoted solely to the business in that state. Therefore we are of opinion that some basis for a division independently of gas sales must be invoked in ascertaining the value of the property used and useful in the regulated business of this state. *Minnesota Rate Cases,* 230 U. S. 356, 33 S. Ct. 729, 57 L. Ed. 1511; *Smith*

v. *Illinois Bell Telephone Co.*, 282 U. S. 133, 51 S. Ct. 65, 75 L. Ed. 255. The mere fact that the utility is an integrated whole, does not, in our opinion, preclude the commission from giving consideration to the percentage of gas transported within the three states. Williamson, the commission's statistician, in making his report took into consideration the foregoing as well as the percentage of gas sold in the three states. In so doing, he allotted to this state 53%. of the production, 33% of the transmission, and 48% of the general properties, or an over-all average of 40.6%. Without approving his percentages, we remand the matter of allocation for further consideration in conformity with the foregoing suggestions.

The foregoing naturally calls for an adjustment of the value of the leaseholds, and, in case an appreciated value is established, the deduction of delay rentals on a like basis.

## OPERATING EXPENSES

We will now give our consideration to certain alleged errors in the findings relating to operating expenses.

### WRONG CHARGES

The commission erroneously charged $31,289, expended during 1931 for engineering, superintendence, law, and other administrative expenses, incurred in connection with additions to the plant of the company to operating expenses. This item should have been capitalized, and we so direct.

### RETIREMENT AND AMORTIZATION

The commission charged to the annual operating expense $196,772 to take care of retirements from service of worn out property, and $133,006 to return to the company its investment in production and transmission properties (less land and right of ways) over the estimated

future life of the company—thirty years. One-half of each of the foregoing amounts was allotted to West Virginia.

The first item ($196,772) was arrived at by taking the average gas property retirements for the years 1926-1931, inclusive, less salvage. This procedure is attacked by the city on the ground that the average amount set up on the utility's books over the same period by the executives of the Columbia Engineering and Management Corporation for the purpose of caring for such retirements, was only $129,407. It also comments on the fact that no one of the yearly estimates, since the property has been a part of the Columbia System (1926-1931), has equalled the sum allowed by the commission, and the further fact that the lowest estimate (1931) was $93,555. The city would have the company limited to the last-mentioned amount. As revealed by the Williamson report, the books of the company show a credit balance in the depreciation and depletion reserve account on December 31, 1931, of $1,350,769, as against $1,742,126.23 for the year ending 1926. The company passes off this reduction in the credit balance by the assertion that the $93,555, as well as the other amounts set up on the books by the experts, was a mere estimate, and therefore not binding on the commission, especially in view of the uncontroverted experience of the company. The commission's finding is approximately 2-1/4% of the depreciable property as found in this case. Whether such a percentage is supported by the experience of the company is, in the first instance, for the commission. However, in view of the material additions during 1926-1931, by purchase of other operating gas properties, the manner in which such purchases were entered upon the books of the company, and the average life of the depreciable property, we must hold that the commission was in error in its method of computing the annual allowance for retirements.

Recurring to the amortization charge of $133,006, we cannot accord in the finding that the company will cease to function within a period of thirty years. As said in

the case of *Columbus Gas & Fuel Company* v. *Public Utilities Commission,* 127 Ohio St. 109, 187 N. E. 7:

> "That the product natural gas will eventually die is self-evident. When it will die is an assumption. An assumption is no stronger than the facts that support it, and it is just as fair to assume that much of the equipment now used in the transportation and distribution of natural gas will be utilized for the transportation and distribution of artificial gas in the future.
> "We must accredit to the men who organize and manage public utility corporations in which millions are invested, a higher degree of intelligence and a keener foresight than that of the ordinary individual. Hence to say, or even to think, that upon the failure of natural gas the entire property of a natural gas company would be scrapped would be a puny tribute to those responsible for its conduct."

There is nothing to keep the experts in five or ten years from again estimating that the company will cease to exist within thirty years from such time. The decided cases reveal many such instances. In view of the charges to operating expenses, whereby the company is supplied with funds with which to systematically prove and extend their gas reserves, and the charges for maintenance and replacements, it would be unfair, at this time, to burden the consumers in this state with an additional annual charge of $66,003, based on a thirty year life expectancy. In arriving at such amount the commission also erred in not taking into account the item of salvage.

### MANAGEMENT

Of the management fee of $55,855.26 paid in 1931 to the Columbia Engineering and Management Corporation under a contract calling for 2½ % of the company's gross earnings, $25,447.50 was allotted to the business in West Virginia. The commission cut the allotment to $13,-223.80, stating that the proof is conclusive that the ser-

vices are worth at least that sum to the operating concern. In this Commissioner Nethken concurred.

The city criticizes the inclusion of such sum as operating expenses, without the cost of such services being proved—the said Engineering and Management Corporation being a subsidiary of the Columbia Gas & Electric Company. In this it relies upon the case of *Smith* v. *Illinois Bell Telephone Co., supra,* in which Chief Justice Hughes said: "In view of the findings, both of the state commissions and of the court, we see no reason to doubt that valuable services were rendered by the American Company, but there should be specific findings by the statutory court with regard to the cost of these services to the American Company and the reasonable amount which should be allocated in this respect to the operating expenses of the intrastate business of the Illinois Company in the years covered by the decree." In other words, the American Company was, so far as rate payers were concerned, a mere department of the Illinois Bell Telephone Company, and the cost of rendering such service is a material factor in ascertaining how much of the amount paid out to the American Company may be included in operating expenses. To like effect: *Dayton Power & Light Company* v. *Public Utilities Comm. of Ohio, supra; Columbus Gas & Fuel Co.* v. *Public Utilities Comm. of Ohio, supra.* As tersely stated by Mr. Justice Cardozo, in the last cited case: "The Columbus Company (distributor) and the Ohio (seller) being parts of a single affiliated system, their intercorporate agreement does not control the price to be paid by consumers if the rate thereby established is higher than a fair return."

While there is no direct evidence of the actual cost of the service rendered the Natural Gas Company, which is one of the many companies under the Engineering and Management Corporation, yet it does appear that for the year ending December 31, 1931, the latter's net income was approximately 40% of its actual expenditures. In view of this the commission, upon the theory that such savings as occur to utilities from group management

·should be shared by their customers, found that 50% of the charge made against the company was a fair amount to be included in operating expenses for managerial salaries, engineering, etc. In view of the fact that the several companies are under similar contracts, the per cent ranging from 2 to 2½% of the gross revenues, we are of opinion to uphold the commission's finding in regard to the foregoing charge.

## GAS PURCHASED FROM AFFILIATED UTILITY

In 1925 a contract was made with the Manufacturers Light & Heat Company, an affiliated company, for purchase of gas at 50c per thousand cubic feet. In 1931 962,865 thousand cubic feet were purchased under such contract, 366,074 thousand cubic feet being delivered into the company's distribution lines in the city of Wheeling at a cost to the company of $183,037. The commission took the figure 31½c per thousand paid by the Manufacturers at points 50 and 70 miles distant to which it added 5.46c for transmission costs, making a total cost to the Manufacturers of 36.96c per thousand cubic feet, as the basis of calculation. According to the latter, an allowance of $135,300.95 was charged to operating expenses instead of the $183,037 contended for. The city, however, claims that it should not be required to pay in excess of 25c per thousand cubic feet, in view of the fact that the company has for years been purchasing gas from Carnegie at such rate. The company says that the Carnegie cannot furnish the "peak load" gas required in its service. In this it must carry the burden. In ascertaining the fair value of purchased gas the principles laid down by the Supreme Court of the United States in the *Columbus* case should be followed.

## RATE CASE EXPENSE

The city contends that the annual allowance to the utility of $15,723.52 for a period of five years, or a total

of $78,627.60, for rate case . expense is excessive. It points to an allowance of $60,000 made in the United Fuel Case (*Charleston* v. *Public Service Commission, supra*), said latter company being valued at eight times that of the instant utility. In arriving at such figure the commission seemingly ignored the utility's claim for $225,128.21 (the amount expended by it), and as a test of reasonableness adopted what it termed a total cost to the public, i. e. the city's expenditures of $48,264, an allowance of $20,000 for counsel fees, and the commission's expense of $10,363, or a total of $78,627.60.

Expenses of a rate case are a proper charge to operating expenses, but should be spread over a number of years. *West Virginia Water & Electric Co.,* Vol. 1, P. S. C. W. Va. Rep. 706, 713; *Clarksburg Heat & Light Co.,* Vol. 2, P. S. C. W. Va. Rep. 611, 639; *New York & Richmond Gas Co.* v. *Prendergast,* 10 Fed. (2d) 167, 181; *Streator Aqueduct Co.* v. *Smith,* 295 Fed. 385, 391; *West Palm Beach Water Co.* v. *West Palm Beach,* P. U. R. 1930A, 177, 215. However, such charge must be reasonable. *Cumberland & Allegheny Gas Co.,* Vol. 2, P. S. C. W. Va. Rep. 514, 552. As said in the latter case, the commission, although not the manager of public utilities, has the power to scrutinize carefully extravagant expenditures in a rate case. Such allowances, in the absence of statute, are permitted to be included in operating expenses on the theory that the utility, being subject to regulation, should be provided with sufficient funds with which to protect itself against confiscatory rates. The amount of the allowance depends largely on the final outcome of the litigation.

## Is the City Entitled to Its Expense?

The city presented a motion requesting the allowance of $48,264 for expense incurred in championing, as it says, the cause of the consumers, together with an additional sum of $10,000 for the services of special counsel. This the commission refused. Such claim is based upon

two premises, namely, (1) that the tax limitation amendment has deprived the city of even the necessary revenues with which to carry on its usual governmental functions, and (2) that, it is only fair that the gas consumers should be required to contribute rateably to such expense. Such charge, in the absence of the actual agreement of the rate payers, would necessarily be dependent upon a materially beneficial ruling in favor of the consumers, otherwise the consumer would be thrown open to unnecessary rate litigation at the instance of designing persons. If, on the final disposition of the case the ruling of the commission is materially beneficial to the consumers, it may allow a reasonable sum for expenses, to be charged over a period of years—such sum not to be considered in arriving at a proper rate base.

## Rate of Return

The commission, in its opinion, points out that the return amounts to approximately 4½ per cent, and intimates that 6½ per centum would not be held to be unreasonable. Commissioner Nethken, in his dissent, states that "6 per cent is reasonable at this time." Inasmuch as a definite finding was not made on this point, we are not disposed at this time to consider what rate would be reasonable, except to state that courts will take judicial notice of existing business conditions in determining what a reasonable rate should be. *Dayton Power & Light Co.* v. *Public Utilities Comm. of Ohio, supra.* A regulated utility, at a time when business generally is at a low ebb of activity, must be content with a more moderate return than is its due in times of normal or more nearly normal business conditions. *Charleston* v. *Public Service Commission, supra.*

## Conclusion

The utility contends that the mere fact that error has been committed is not enough to warrant a reversal, but

that such error must be such as to make a material difference in the conclusion. While such principle would undoubtedly apply where a particular item or number of items were erroneously included, we are of opinion, in view of the apparent error in arriving at the present value undepreciated of the physical properties, and in ascertaining the per cent of depreciation, as well as the failure of the commission to make a specific finding as to what it considered a fair return, that it has no application here. Concretely stated we would caution the commission to give greater heed to actual value and less to theories. We, accordingly, reverse the commission and remand the case.

*Reversed and remanded.*