(No. 24836.—

THE PEOPLES GAS LIGHT AND COKE COMPANY, Appellee, *vs.* JAMES M. SLATTERY *et al.* Appellants.

*Opinion filed December 12, 1939—Rehearing denied Feb. 7, 1940.*

34

STONE and JONES, JJ., dissenting:
FARTHING, J., specially concurring.

OTTO KERNER, Attorney General, and BARNET HODES, Corporation Counsel, (MONTGOMERY S. WINNING, HARRY R. BOOTH, W. ROBERT MING, JR., THOMAS A. KEEGAN, JOHN P. BARNES, JR., FREDERICK ZAZOVE, and WILLIAM F. SCHULZ, JR., of counsel,) for appellants.

COOKE, SULLIVAN & RICKS, WILSON & MCILVAINE and SIDLEY, MCPHERSON, AUSTIN and BURGESS, (GEORGE A. COOKE, FRANCIS L. DAILY, EDWARD H. FIEDLER, JOHN M. CONNERY, JAMES T. MULLANEY, WILLIAM P. SIDLEY, JAMES F. OATES, JR., JOHN P. WILSON, CLAY JUDSON, and JOSEPH R. GRAY, of counsel,) for appellee.

Mr. JUSTICE GUNN delivered the opinion of the court:

This is a direct appeal from a decree of the circuit court of Cook county, entered on the complaint of the Peoples Gas Light and Coke Company, appellee, enjoining appellants, members of the Illinois Commerce Commission, and Otto Kerner, Attorney General, from enforcing against appellee certain rates for gas in the city of Chicago, on the ground that such rates deprive appellee of its property without due process of law, in violation of the State and Federal constitutions. In its complaint the appellee, hereafter referred to as the company, alleged that after the imposition of an additional three per cent tax upon its gross receipts in 1935, the existing rate schedule (No. 17) had become confiscatory and that the Illinois Commerce Commission, hereafter referred to as the commission, had repeatedly refused to permit any increase. The case involves the validity of a statute and the construction of the State and Federal constitutions.

The rates involved are those contained in the company's schedule ICC No. 17, which became effective April 15, 1934. On July 1, 1935, the company became subject to the three per cent public utility tax upon its gross receipts, amounting to about $800,000 per year. On July 16, 1935, the company filed with the commission a new schedule of rates (No. 18) proposing a flat increase of three per cent to cover the amount of that tax. On August 7, 1935, the commission entered an order suspending schedule No. 18. After hearing evidence, the commission, on June 12, 1936, entered a final order permanently suspending schedule No. 18. On June 26, 1936, the company filed with the commission schedule No. 19, proposing an increase in rates from 58 cents to 90 cents per month for the first two therms of gas used, and also an increase from 60 cents to 90 cents in the minimum monthly bill. This would have increased the company's revenue about $3,000,000 per year. The commission entered an order on July 1, 1936, suspending

schedule No. 19 until November 24, 1936, and set the case for hearing for July 15. On that date, the commission received all the evidence that had been introduced in the case involving schedule No. 18, and the company introduced certain additional testimony and rested its case. On July 24, 1936, the company petitioned the commission to install the rates in schedule No. 19 as temporary rates until the entry by it of a final order. The commission entered an order on August 21, 1936, denying this petition. On September 1, 1936, the company filed its complaint in equity in the circuit court of Cook county, against the members of the commission and the Attorney General, reciting all the proceedings before the commission, and alleging that the rates in schedule No. 17 were so low as to deprive the company of its property without due process of law, and sought relief by temporary and permanent injunction to restrain the defendants from enforcing such rates against the company. It was alleged that the present value of the company's property was $156,000,000, and that it was entitled to a return thereon of seven per cent, and that by reason of the commission's suspension of the increased rates in schedule No. 19 the company was being continuously deprived of a fair return upon the value of its property by more than $3,000,000 a year, which loss was irretrievable, and that there was no adequate remedy to protect it against such loss except in a court of equity. The complaint further alleged that section 68 of the Public Utilities act, in so far as it purported to prohibit the exercise of equity jurisdiction in such a case, was invalid as a direct violation of section 12 of article 6 of the Illinois constitution, which vests the circuit courts with original jurisdiction in equity, and also contained other allegations pertinent to the character of the case.

The defendants filed their answer to the complaint September 10, 1936, denying the inadequacy of the existing rates, alleged that the circuit court lacked jurisdiction, and

that the suit was brought prematurely. The answer also alleged that the value of the company's property did not exceed $120,000,000, and that a fair and just rate of return would not exceed six per cent, and that the company, for the year 1936, would earn more than that, and that the existing rates were fair and reasonable.

The company applied to the circuit court for a temporary injunction supported by affidavit, and counter-affidavits were filed by the commission. On October 23, 1936, the court granted a temporary injunction restraining the defendants, pending final hearing, from enforcing the rates in schedule No. 17, upon condition that the company would not charge rates in excess of those in schedule No. 19, and required the company to impound monthly, in a bank, as a special fund subject to the order of the court, the difference between the existing rates and schedule No. 19, and provided for refunds of the impounded money to the consumers in the event the company should fail to establish the rates in schedule No. 17 were confiscatory. On appeal, the Appellate Court for the First District entered an order staying the effect of the temporary injunction, and, on December 8, 1936, entered a judgment vacating the injunction. (*Peoples Gas. Light and Coke Co.* v. *Slattery,* 287 Ill. App. 379.) To review that judgment the company, on December 11, sued out of this court a writ of error and applied for a *supersedeas,* and the commission moved to dismiss the writ for want of jurisdiction. On February 16, 1937, this court denied a *supersedeas* but took the case under advisement, together with the motion to dismiss. Meanwhile the commission further suspended schedule No. 19 until May 24, 1937.

On January 20, 1937, the circuit court referred the cause to a master for hearing. The commission also conducted its hearing as to schedule No. 19. On March 4, 1937, the parties stipulated that the evidence introduced and to be introduced before the commission should be promptly

introduced before the master in chancery, and this was done. The commission entered its final order May 21, 1937, holding that the existing rates were reasonable, and permanently cancelled schedule No. 19. On May 25, 1937, the company filed in the circuit court its amended and supplemental complaint, reciting all occurrences subsequent to the filing of the original complaint, again alleging the existing rates were confiscatory and prayed for additional relief against the enforcement of the final order of the commission on schedule No. 19. The company did not appeal from the ruling of the commission on schedule No. 19. Answers were filed and additional evidence taken, and on September 10, 1937, the master submitted his report to the parties and after passing upon appellants' objections filed it with the court. On October 4, 1937, the company filed its motion in this court to dismiss its writ of error, on the ground the case had become moot and it was accordingly dismissed. After hearing arguments on exceptions to the master's report, the circuit court, on January 26, 1938, filed its opinion finding the issues in favor of the company. On January 31, 1938, the commission moved the court to rerefer the cause to the master for the introduction of additional evidence, but this motion was overruled. On February 4, 1938, the chancellor entered a final decree, finding the circuit court had jurisdiction of the parties and of the subject matter, and that schedule No. 17, and rates contained therein, were confiscatory and in violation of both State and Federal constitutions, and that section 68 of the Public Utilities act, in so far as it purported to deny jurisdiction of courts of equity, was unconstitutional and void, and that the company had no adequate remedy except by proceeding in equity and would suffer irreparable injury unless an injunction should issue restraining the enforcement of the rates set out in schedule No. 17. The final decree restrained the commission from enforcing schedule No. 17 against the company and enjoined the final order of the commission

upon schedule No. 19 and the provisions of the Public Utilities act, to the effect that the company be required to adhere to those rates found reasonable in that hearing. The final decree also required the company, pending final disposition of the cause on appeal, to deposit monthly, as a special fund, the difference between the rates set forth in schedule No. 17 and any money collected by the company in excess of those rates, in like manner as provided in the temporary restraining order.

The points chiefly relied upon for reversal are that this suit was prematurely brought; that the circuit court lacked jurisdiction of the subject matter; that the court erred in holding section 68 of the Public Utilities act unconstitutional, and that the circuit court erred in the valuation of the company's property, the return it was entitled to, the amount it was actually earning and what constituted a confiscatory rate as distinguished from a fair and just rate.

Appellants claim that the company should have applied to the commission for a rehearing of the order of August 21, 1936, denying the company's petition to install schedule No. 19 as a temporary rate and if a rehearing had been denied, or if upon a rehearing relief was denied, that an appeal should have been taken to the circuit court under provisions of the Public Utilities act, and that the remedies provided by law were adequate and exclusive and a court of equity, therefore, has no jurisdiction to grant any kind of relief during the period within which the commission is authorized, under the statute, to consider an application for increase in rates, and that the company should also have applied to the commission for a rehearing of its final order of May 21, 1937, permanently canceling schedule No. 19, and have taken an appeal from such action under the statute.

It is necessary to briefly examine the pertinent and applicable provisions of the Public Utilities act. There are three sections of the act which have particular application to all proceedings with reference to the changing of rates

and appeals from the commission and proceedings in court, namely sections 36, 67 and 68. (Ill. Rev. Stat. 1937, chap. 111⅔, pars. 36, 71, 72.) Paragraph 36 (section 36) applies to the filing of a new rate by a utility. This may be done by filing a new schedule which operates as a petition to install such rates and cannot go into effect for thirty days. If it is in effect thirty days, it becomes a legal rate. The commission has power to suspend this schedule at once without a hearing, first for a period of one hundred and twenty days, and for an additional six months if necessary. By this paragraph the commission has authority, also, to suspend a rate legally in force upon a *hearing* and may temporarily suspend such rate, but if it does so, and it is afterwards found a proper one, the company must be reimbursed for its losses by an increased rate until these losses are made up.

Paragraph 71 (section 67) relates to procedure before the commission and, among other things, provides that after *notice and hearing,* it may rescind or amend any rule, regulation or order made by it, and that within thirty days after the service of such rule, regulation, order or decision, the utility may apply for a rehearing which must be acted upon within twenty days, and no appeal shall be allowed unless and until an application for a rehearing is made.

Paragraph 72 (section 68) provides for an appeal within thirty days, from two kinds of orders: First, from those orders which the commission has made on a hearing, and second, from those orders which the commission is authorized to make *without a hearing.* In the first kind of an order application for rehearing is absolutely necessary. For the second kind of an order the statutory language is: "No proceeding to contest any rule, regulation, decision or order which the commission is authorized to *issue without a hearing* and has so issued, shall be brought in any court unless application shall have been first made to the commission for a hearing thereon and until after such applica-

tion has been acted upon by the commission," etc. Applying the provisions of the statute to the present case we find that filing schedule No. 19 operated as a petition for an increase in rates and became effective within thirty days unless suspended. The commission had authority to suspend it without notice, which it did. Under paragraph 72 this order of the commission could not be questioned unless the company asked for a hearing thereon. The company did ask that the rate which the commission had suspended be installed as a temporary rate. This petition the commission denied. No further action was necessary, as the statute does not require an application for a rehearing upon a matter which the commission is authorized to order or direct without a hearing. In such cases all that is required is to request a hearing and get a decision. This was done. It is true that the pleadings do not follow the precise course outlined by the statute, but it is clear that the company petitioned that the scheduled rates, which had been suspended without notice, be installed as temporary rates, and this was refused by the commission.

What we have just pointed out indicates that the legislative action of the commission on the question of a temporary rate had been terminated. So far as the company getting relief from alleged confiscation pending a hearing of the merits of schedule No. 19, there was no further action that could be taken by the commission. It had decided the question of temporary rates and an appeal from this order to the circuit court would be heard upon the record and nothing done other than to affirm or remand to the commission, the circuit court being without authority to fix rates, temporary or otherwise. *Chicago, Burlington and Quincy Railway Co.* v. *Commerce Com.* 345 Ill. 576; *Commerce Com.* v. *Chicago and Eastern Illinois Railway Co.* 332 id. 243.

The statute did provide a method in which the utility could be adequately protected. The commission could have

allowed schedule No. 19 to become effective by remaining in force thirty days and then have suspended it, in which case the statute affords relief at the end of an investigation. It was also within the power of the commission to allow temporary rates which the commission could control by special deposits, and by requiring a refund if an investigation proved they were not justified. If neither of these courses were authorized by the commission and confiscation took place, the question arises whether these means of preventing confiscation are exclusive and prevent any application to a court except by appeal as provided by statute, or whether, in a proper case, equity may interpose where the law does not adequately protect the utility or where the manner of administering a law brings about the injury. Jurisdiction cannot be taken away from the equity courts unless a statutory remedy is substituted which is adequate to·prevent irreparable injury. Prior to the passage of the Public Utilities act, courts of equity had jurisdiction and power to enjoin enforcement of confiscatory rates. (*City of Chicago* v. *Rogers Park Water Co.* 214 Ill. 212.) The circuit courts of this State derive original jurisdiction in all equity cases from section 12 of article 6 of the constitution, and the legislature cannot validly limit those powers. (*Stephens* v. *Chicago, Burlington and Quincy Railway Co.* 303 Ill. 49; *Howell* v. *Moores,* 127 id. 67; *Myers* v. *People,* 67 id. 503; *Frackelton* v. *Masters,* 249 id. 30.) The power of issuing injunctions to prevent irreparable injury has long been an undoubted right of equity courts, of which they cannot be deprived, under the constitution, except in cases where a substitute remedy is provided that gives the same measure of relief.

In support of the contention that the statutory remedy by appeal under the Public Utilities act is adequate, and excludes the jurisdiction of the equity courts, the commission refers to *Hoyne* v. *Chicago and Oak Park Elevated Railroad Co.* 294 Ill. 413, *City of Chicago* v. *O'Connell,* 278

id. 591, *Chicago North Shore and Milwaukee Railroad Co. v. City of Chicago,* 331 id. 360, *Public Utilities Com. v. Springfield Gas and Electric Co.* 291 id. 209, and *Illinois Bell Telephone Co. v. Commerce Com.* 306 id. 109. In the *Hoyne case, supra,* the State's attorney filed an information in chancery, asking for an injunction to restrain the utility from putting in effect a rate fixed by the commission, as being an infringement of a contract ordinance. In *City of Chicago v. O'Connell, supra,* a bill for injunction was brought by the city to restrain the Commerce Commission from enforcing certain orders with respect to the methods of operating the city railroads in which the city was interested. In *Chicago North Shore and Milwaukee Railroad Co. v. City of Chicago, supra,* the railroad filed a bill for injunction to enjoin the city from interfering with appellant's use of the elevated railroad tracks, a right claimed by the city under the original franchise. The decree of the lower court, upholding the city, was reversed in the Supreme Court. In *Public Utilities Com. v. Springfield Gas and Electric Co. supra,* the proceeding started before the commission and by appeal came to the Supreme Court. In *Illinois Bell Telephone Co. v. Commerce Com. supra,* a bill for injunction was filed to enjoin the commission from bringing any suit or proceeding to enforce a certain schedule of rates. An application for new rates had been made and, after considerable delay, the proposed new rates were promptly suspended without the commission entering any order as to whether the new rates would be just and reasonable or what would be just and reasonable rates. The court, in that case, held the remedy was by *mandamus* rather than by injunction. This brief analysis discloses that none of these cases holds that under the Public Utilities act the remedy by appeal is exclusive, and in four of these cases, where the proceeding was started by a bill in chancery, no question was raised as to the right of a court of equity to hear the case.

There is a distinction between the method of determining what a just and reasonable rate may be and the manner of reviewing it, from a question of determining whether a rate already in force and not in any manner under review, is confiscatory. In the first instance, administrative process is constitutionally sufficient to determine that question, and a provision for review by courts adequately protects the rights of the utility, but when the legislative process of rate-making is ended and the rate in force becomes confiscatory,—that is, results in the taking of property without process of law,—and either adequate means under the administrative provisions or the manner of administering such means is inadequate to prevent confiscation, then a court of equity has jurisdiction to remedy the wrong in an independent equity proceeding.

The action of the commission which immediately preceded the filing of the equity suit in this case was its denial to install a temporary rate. Its order in this respect ended its legislative function so far as temporary rates were concerned. Without temporary rates the company would have to operate many months without an adequate return and with no possibility of getting any compensation if it were eventually successful. An appeal to the circuit court to review the commission's action in refusing a temporary rate would not grant any relief because the courts would not have put such temporary rates into effect. (*Peoples Gas Light and Coke Co.* v. *City of Chicago,* 309 Ill. 40; *Alton and Southern Railroad* v. *Commerce Com.* 316 id. 625; *Commerce Com.* v. *Chicago and Eastern Illinois Railway Co. supra.*) Neither pending such an appeal, nor as a result of a reversal of the commission's order, could the company have obtained any relief from existing rates until the main controversy was determined.

The company had petitioned, by schedule No. 18, to have its rates increased to the extent of $800,000 a year and this had been denied. After this was done, schedule

No. 19 sought an increase of approximately $3,000,000 a year, and the temporary rate sought would have put it into effect. When this was denied, it is not reasonable to suppose that any action on appeal to the circuit court would bring any relief pending hearing of the main cause, either from disinclination of the commission to act, or from the time it would necessarily take to prepare a record and get the cause heard in the circuit court. In comparable cases it has been held that at this stage of the proceeding the company is justified in seeking relief in a court of equity. (*Prendergast* v. *New York Telephone Co.* 262 U. S. 43, 67 L. ed. 853; *Smith* v. *Illinois Bell Telephone Co.* 270 id. 588, 70 L. ed. 747.) The last case arose in Illinois after the passage of our present Public Utility act. The facts show that the telephone company was operating at a loss. A schedule of rates had been filed which later became effective. Before the order on such rate was made, a second schedule was filed for increased rates. This was suspended by the commission from May, 1920, until October, 1921, when it was permanently suspended. An appeal was taken to the circuit court, and the commission's order remanded for further proceedings. The commission redocketed the cause and continued hearings until September, 1922, when the company filed a written motion requesting the commission to make effective a temporary schedule of rates pending final determination, and this was denied almost immediately. In July, 1923, attention was called to the delay and a request made that the commission set an early hearing, which was ignored, and, finally, a suit in equity was brought in June, 1924, in the United States court. In that case the commission sought to have the injunction set aside because the company, prior to filing its bill, had not exhausted its legislative remedies. The court, in overruling this contention said: "Property may be as effectively taken by long continued and unreasonable delay in putting an end to confiscatory rates as by express affirmance of them,

and where, in that respect, such a state of facts is disclosed as we have here, the injured public service company is not required indefinitely to await a decision of the rate-making tribunal before applying to a Federal court for equitable relief. The facts which the motion to dismiss conceded present a far stronger case for such relief than any of the cases with which this court dealt in *Oklahoma Natural Gas Co.* v. *Russell,* 261 U. S. 290, 67 L. ed. 659, *Prendergast* v. *New York Telephone Co.* 262 id. 43, 67 L. ed. 853, *Pacific Telephone Co.* v. *Kuykendall,* 265 id. 196, 68 L. ed. 975, and *Banton* v. *Belt Line Railroad Corp.* 268 id. 412, 69 L. ed. 1020." The question of confiscation is a judicial one (*City of Edwardsville* v. *Illinois Bell Telephone Co.* 310 Ill. 618; *Mt. Carmel Public Utility and Service Co.* v. *Public Utilities Com.* 297 id. 303;) and courts of equity of the State of Illinois, under the constitution, have no less power than the courts of equity of the United States in determining this question. The *Smith case, supra,* involving as it does the Public Utilities act of Illinois and the refusal to install a temporary rate, with practically the same question raised on the point of jurisdiction, is controlling of the situation. It is true that the delay was not as long continued in the present case as in the *Smith case, supra,* but the principle underlying the cases is the same, and it is our conclusion that the circuit court had jurisdiction of the cause.

It is claimed that section 68 of the Public Utilities act prevents the relief prayed in this case. The latter part of this section provides that when no appeal is taken from an order of the commission the parties affected thereby shall be deemed to have waived the right to have the merits of the controversy reviewed by a court, and there shall be no trial of the merits of any controversy in which the order was made by any court to which application may be made for a writ to enforce the same or in any other judicial proceeding. This provision must be construed to apply to

the procedure of reviewing the acts of the commission by the statutory appeal provided, as otherwise it would absolutely bar any relief in courts of equity and thus oust them from their constitutional powers in cases where the statute does not provide for adequate relief, and likewise would be a denial of the right of judicial review in cases where the acts or omission of the commission violate constitutional guarantees. (*Ex Parte Young,* 209 U. S. 123, 52 L. ed. 714; *Missouri and Pacific Railway Co.* v. *Tucker,* 230 id. 340, 57 L. ed. 1507; *Ohio Valley Water Co.* v. *Ben Avon Borough,* 253 id. 287, 64 L. ed. 908.) We must presume the legislature did not intend this part of section 68 to apply to cases arising outside of the scope of the Public Utilities act. We will construe a law, if possible, in such a manner as to render it constitutional. (*Punke* v. *Village of Elliott,* 364 Ill. 604; *Illinois Bell Telephone Co.* v. *Ames,* 364 id. 362; *Boshuizen* v. *Thompson and Taylor Co.* 360 id. 160.) The legislative process of fixing schedule No. 17 having been completed, and the rate having been in force for more than two years, the company was entitled to make an application for higher rates to be installed temporarily while the merits of the main application were being heard. Holding, as we have, that the legislative process upon the question of the installation of the temporary rate was completed as far as the commission was concerned, we are of the opinion that the original complaint was not prematurely filed.

This brings us to a consideration of the merits of the case. The record is large. The abstract, final order of the commission, master's report and the opinion of the chancellor contain several hundred pages and, in addition, the briefs are exceedingly voluminous. To recite, in detail, all of the evidence bearing upon the ultimate issues and resolve all the conflicting contentions of law, would unduly prolong this opinion, and we shall, therefore, content our-

selves with a discussion of the controlling issues without going into all the minute details of evidence or refinements of legal positions.

The hearings conducted by the commission on schedule No. 19, and those by the court to permanently enjoin the enforcement of schedule No. 17, proceeded concurrently. and resulted in a finding by the commission that the. proposed rate No. 19 was excessive and the old rate adequate, and, on the other hand, a decree and finding by the court that schedule No. 17 was confiscatory and that the proposed schedule No. 19 would produce a return of little more than four per cent upon the value of the company's property. Notwithstanding these two proceedings were conducted concurrently, the true issue presented and to be determined by this court is whether the rates provided by schedule No. 17 are confiscatory, even though the commission, in rejecting schedule No. 19, was required to find what would be a reasonable rate. *Illinois Bell Telephone Co.* v. *Commerce Com. supra.*

The legislature has vested in the Commerce Commission the exclusive functions of fixing rates of public utilities which will be just and reasonable and produce a fair return upon the property used and employed in the public service. Even though a court may hold that the rates authorized by a commission are inadequate or illegal and restrains their enforcement, it cannot make new rates. (*South Chicago Coal and Dock Co.* v. *Commerce Com.* 365 Ill. 218.) Only the Commerce Commission has this power. (*Commerce Com.* v. *Chicago and Eastern Illinois Railway Co. supra; Peoples Gas Light and Coke Co.* v. *City of Chicago, supra.*) Orders of the commission are entitled to great weight, and a court will not set one aside unless it is arbitrary or unreasonable or in clear violation of a rule of law, (*South Chicago Coal and Dock Co.* v. *Commerce Com. supra,*) and when the sufficiency of an order of the commission is questioned it will not be set aside unless it is clearly against the

manifest weight of the evidence. (*Commerce Com.* v. *Chicago and Eastern Illinois Railway Co. supra; South Chicago Coal and Dock Co.* v. *Commerce Com. supra.*) The basis of the company's contention in court is that schedule No. 17 is confiscatory, and where this is the issue the burden is upon the company to make a convincing showing that confiscation, in fact, exists. *Lindheimer* v. *Illinois Bell Telephone Co.* 292 U. S. 169, 78 L. ed. 1182; *Dayton Power and Light Co.* v. *Public Utility Com.* 292 id. 299, 78 L. ed. 1267; *Los Angeles Gas and Electric Corp.* v. *Railroad Com.* 289 id. 287; *American Toll Bridge Co.* v. *Railroad Com. of California,* 307 id. 486, 83 L. ed. 1414.

There can be no argument but that the enforcement of rates by the Commerce Commission which would bring about confiscation would be violative of law. A determination of this question must necessarily depend upon the value of the company's property and the net return upon such value that will be realized under the rate allowed. Both value and earnings must be ascertained in the light of certain well-established rules to be observed by both courts and commissions. It is around this feature of the case the principal controversy arises, as there is a decided difference of opinion between the company and the commission, not only as to how the value of the public utility is to be determined for rate-making purposes, but also the proper elements to be taken into consideration to ascertain the net return that will be produced by the authorized rate. One of the principal questions is the fair value of the property of appellee, used or useful in the distribution of gas. Each of the parties, in fixing the fair value, considered land separate from the structures on the land. The company offered evidence of the reproduction cost new of the structures, as of the date of the hearing, and also offered the original or historical cost of the structures, trended to present prices,—*i.e.,* all the material parts and labor progressively used in developing the plant were itemized separately and taken

at present costs, and thus produced what they call original cost trended to present prices.

Both of the parties offered evidence of the present value of the lands owned by appellee. Without going into the details of each separate tract, the value of the lands, without the structures, was given by the respective witnesses as follows: Commission's witnesses, $6,496,902; company's witnesses, $11,737,175. The commission's witnesses found that of this property the real estate included property of the value of $2,291,296, non-useful in the utility enterprise, leaving a net value of the land of $4,205,606. From the testimony offered on both sides on the value of lands, the commission found that the value of lands used or useful was $4,732,822, and the value of lands not used or useful was $1,727,917. On the other hand, the master and chancellor, from the same testimony, found the value of all the lands to be $9,180,259.50, and the value of the land not used or useful to be $1,466,976.90, leaving a net valuation of lands used and useful of $7,713,282.60. There is no dispute about the original cost of all the land, both used and useful, being $4,556,121.

It is impossible to reconcile the testimony of the respective witnesses upon the value of lands. The lands comprise some thirty-three tracts, ranging in value from a few hundred dollars to one tract of three million dollars. In some instances, the appraisers agree upon the value, and in others the differences range from a small per cent to over 50 per cent. On total results, it will be seen that the valuation fixed by the commission's witnesses was about two-thirds that of the company's witnesses. The commission's valuation was less than half of that fixed by the company and the master's valuation about seventy-five per cent of that of the company. The master and the commission both found the valuation of the land by the company's witnesses to be excessive. Both found there was a considerable amount of the real estate not used or useful. There is

nothing definite and certain about the value of these several tracts of real estate, other than the original cost. In the very nature of things it is more or less a speculation depending upon which expert is believed. We cannot say the value fixed by the commission was shown to be unreasonably low.

## ORIGINAL COST.

The original cost new, as shown by the company, of the other physical property, is $111,330,067.67. There is no opposing proof upon this question. However, included in this amount is the sum of $1,957,753, of items which were charged to operating expenses. Most of the items were part of general expenses originally charged to operation and now allocated to construction. The inclusion of this item in cost of property in our opinion, was error.

The original cost of property for rate-making purposes may not be increased because of a change in the company's policy with respect to charge items as between operation and construction. (*Knoxville* v. *Knoxville Water Co.* 212 U. S. 1, 53 L. ed. 371.) In *Lindheimer* v. *Illinois Bell Telephone Co. supra,* where amounts charged to operating expenses and charged to depreciation reserve were too high, the company was not permitted to show, in fact, that part of such expenses went into the capital structure, the court saying: "If the amounts charged to operating expenses and credited to the account for depreciation reserves are excessive, to that extent subscribers for the telephone service are required to provide, in effect, capital contributions, not to make good losses incurred by the utility in the service rendered and thus keep its investment unimpaired, but to secure additional plant and equipment upon which the utility expects a return." In *Wheeling* v. *Natural Gas Co. of West Virginia,* 115 W. Va. 149, 175 S. E. 339, it is held that where overhead items of physical property were charged to operating expenses, they could not be changed into the capital account for rate-making purposes because, while

such expenses were being so charged, the rates were undoubtedly fixed and based upon their being a part of regular expenses. It seems clear that it is not proper to build up operating expenses and get the advantage of a rate authorized to cover them, and later change the method of accounting to include such excess items as a part of the investment of the company, when, in reality, the money has been furnished by the customers of the company. The original cost, to this extent, was excessive and we find that the commission's original cost valuation of $109,750,000 is justified by the evidence.

### REPRODUCTION VALUE NEW.

The company witnesses testify the total value of the property of use and useful new to be $165,682,411, which is made up of the following: "Physical property, $140,-348,326; going value, $15,000,000; working capital $10,-334,085. The method by which these various amounts were so arrived at is substantially as follows: The real estate values were taken as above stated. The reproduction cost new of the physical property, exclusive of real estate, was fixed by the company's witnesses at the sum of $156,709,359, which included the sum of $2,746,024 applicable to land, only, which was depreciated approximately seventeen per cent, and to which was added the above amount for going value and working capital. The commission's reproduction cost new was fixed by its witnesses at $122,992,633, which was depreciated approximately twenty-seven and one-half per cent, to which nothing was added for going value or working capital. The commission, in its order, found the reproduction cost new of the physical property to be $127,869,677, the depreciation twenty-two per cent, and the value of the useful real estate $4,732,822. It then allowed $7,500,000 for working capital and added to the result thus obtained $7,200,000 for intangibles, making a valuation of $120,000,000. The mas-

ter found the reproduction cost new of the physical property to be $150,467,084, the depreciation upon this amount 17.37 per cent, to which he added $8,250,000 for working. capital and $7,200,000 for going value, and arrived at a valuation, for rate purposes, of $147,497,418.

The discrepancies in everything except the original cost are so startling as to require an examination into the methods used to arrive at the different results.

The valuation of the property of the company was ascertained by the commission considering the present value of the real estate, the reproduction cost new of the structures and equipment, the original or historical cost, and included in the valuation was the sum of $7,500,000 for working capital and the sum of $7,200,000 for any intangible or other elements of value which may not have otherwise been provided for, which would, of course, include going value. The elements considered by the commission were proper elements to be taken into consideration in the valuation of the utility for rate-making purposes or in confiscation cases. (*Smythe* v. *Ames,* 169 U. S. 466, 42 L. ed. 819; *Los Angeles Gas and Electric Corp.* v. *Railroad Com. supra; Driscoll* v. *Edison Light and Power Co.* 83 Sup. Ct. 677; *Public Utilities Com.* v. *Springfield Gas and Electric Co. supra.*) On the other hand, the master, in arriving at the valuation of the property other than real estate, considered only reproduction cost new. It is claimed that the testimony of the witness who took the original cost and trended it to present prices, constituted a consideration of original or historical cost, but this is negatived by the fact that there is approximately only $300,000 difference in value fixed in this manner and by a straight reproduction estimate, and by the further fact that this witness, in submitting his appraisal, refers to it as being an appraisal of the reproduction cost of the used and useful property of the company. The Supreme Court of this State in *Public Utilities* v. *Springfield Gas and Elec-*

*tric Co. supra,* rejected this method of valuing a public utility for rate-making purposes. It was there said: "Appellee contends that the only equitable basis for determining value for rate-making purposes is the cost of reproduction new, less depreciation. This contention cannot be sustained. The basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a public utility under legislative sanction must be the fair value of the property being used by it for the convenience of the public, and in order to ascertain that value the original cost of construction, the amount expended in permanent improvements, the present cost of construction, the probable earning capacity of the property under the particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration and are to be given such weight as may be just and right in each case." This proposition is supported by the great weight of authority. (*Georgia Railway and Power Co.* v. *Railroad Com.* 262 U. S. 625, 67 L. ed. 1144; *Los Angeles Gas and Electric Corp.* v. *Railroad Com. supra; West* v. *Chesapeake and Potomac Telephone Co.* 295 U. S. 662, 79 L. ed. 1640; *Railroad Com.* v. *Pacific Gas and Electric Co.* 302 id. 388, 82 L. ed. 327.) The method of valuation adopted by the court and master was not only erroneous from a standpoint of fixing just and reasonable rates but also upon the issue of confiscation. The fact, however, that the master and circuit court arrived at a valuation in an unauthorized manner is not controlling because the court cannot, in any event, fix the rates that a utility may charge, and is only referred to as showing the great discrepancy between the value fixed by the court and that fixed by the commission. The true inquiry in this case is whether upon the real value of the properties of appellee, the rate the commission authorized the company to charge produces confiscation of appellee's property by allowing it an inadequate return. The fact that the master and court did not consider proper

elements in arriving at a true value does not necessarily mean that the valuation fixed by the commission is correct, and if found to be correct the rate allowed may still bring about confiscation by producing less than a fair return upon the valuation fixed. Our inquiry will, therefore, be directed to the proposition of the value of the company's property as fixed and found by the commission.

The commission offered evidence of its own experts of the reproduction cost new of the property. It considered the testimony of the experts of the plaintiff. It took into consideration original cost, the percentage of depreciation in the existing property, the property useful or non-useful, and in an exhaustive analysis considered all of the elements offered in evidence from both sources tending to establish fair value at the time of the hearing. Its finding was not based entirely upon original cost or entirely upon reproduction new but was a combination of all, as required by the rules above set out. The commission had the right to weigh the testimony of all the experts and make its own determination whether the testimony truly brought out the fair value or contained mere conjectures or suppositions as to the value. (*South Chicago Coal and Dock Co.* v. *Commerce Com. supra; Columbus Gas and Fuel Co.* v. *Public Utilities Com.* 292 U. S. 398, 78 L. ed. 1327; *Railroad Com.* v. *Pacific Gas and Electric Co. supra.*) The order of the commission as a legislative act is presumed to be valid, (*Cotting* v. *Kansas City Stock Yards Co.* 183 U. S. 79, 46 L. ed. 92; *Darnell* v. *Edwards,* 244 id. 564, 61 L. ed. 1317;) and this rule obtains in cases where the court exercises an independent judgment in reviewing the commission's order. (*St. Joseph's Stock Yards Co.* v. *United States,* 298 U. S. 38, 80 L. ed. 1033.) As above pointed out, the burden is upon the company to show that the acts of the commission bring about confiscation, because the purpose of the suit is to arrest the operation of a law on the ground it is void, (*Knoxville* v. *Knoxville*

*Water Co. supra,*) and one of the acts charged is that the order improperly fixed the fair value of the plaintiff's property too low. Recent cases have held that if the commission has given little, if any, weight to testimony as to the reproduction cost new of the utility as being hypothetical and conjectural, it is not a denial of due process of law. (*Railroad Com.* v. *Pacific Gas and Electric Co. supra; Dayton Power and Light Co.* v. *Public Utilities Com. supra.*) The original cost was practically an agreed figure, but the testimony of the experts as to reproduction cost new differed to the extent of approximately $30,000,000. We think it is impossible, from a reading of the testimony, to show that any more weight can be given to the testimony of one set of experts over the other. The Commerce Commission was created for the express purpose of handling cases of this character and its judgment of the value of the testimony is entitled to great weight. The order of the commission allowed the plaintiff $7,500,000 working capital, which does not appear to be inadequate, and there was a further allowance of $7,200,000 to cover other intangible elements. This can properly be used to cover going value or any other intangible elements, under whatever name they may be designated. (*Columbus Gas and Fuel Co.* v. *Public Utilities Com. supra.*) The record is replete with testimony of percentages of depreciation, obsolescence, replacement and maintenance, which it was the province of the commission to consider and analyze. In its report, which appears in the evidence, this seems to have been done with great care.

From the record, we are unable to say that the plaintiff has established, by clear and convincing testimony, that the commission proceeded in an arbitrary or illegal manner in fixing the fair value of all the plaintiff's property used or useful in its utility enterprize at $120,000,000.

In *Georgia Railway and Power Co.* v. *Railroad Com. supra,* the company claimed a valuation of $9,500,000 and the commission made an order finding the value to be

$5,250,000 which was confirmed by the court. In *Los Angeles Gas and Electric Corp.* v. *Railroad Com. supra,* where the claim was made of a $95,000,000 valuation, the court sustained the commission's order, fixing it at $65,500,000. In *United Gas Public Service Co.* v. *Texas,* 303 U.S. 127, 82 L. ed. 708, the company claimed a valuation of $1,231,000. The commission found the fair value $885,000. The court, in affirming the action of the commission, in effect, stated the commission would have been justified in fixing the value at $750,000. These cases are illustrative of the weight given to the order of the commission where the testimony is conflicting. The circuit court erred in entering a decree finding the fair value of plaintiff's property to be in excess of $120,000,000.

## EARNINGS.

The next important question to which we must direct our attention is the earnings of the company, for even though the value of the company's property may not be as high as claimed, still the commission will not be permitted to bring about confiscation of its property by establishing a rate so low as not to pay a fair and adequate return upon the valuation as fixed by the order of the commission.

For the year 1936, it is agreed that the total income of the company was $36,647,888. The company claimed the total operating expenses for 1936, exclusive of depreciation, amounted to $28,947,790. Its depreciation charge for the same year was $2,892,311, and hence the net earnings available for return were claimed to be $4,807,789. These figures apply to property used and useful in the utility business and consequently do not exactly coincide with the balance sheet showing all sources of income and all expenses. The commission found that all expenses, including depreciation, should not exceed $29,507,693. The court and master found the operating expenses, exclusive of de-

preciation, were $28,912,790, the depreciation $2,892,311, and the net earnings available $4,842,787, there being only a difference of approximately $35,000 between the master's finding and that claimed by the company. The principal difference of opinion between the company and the commission arises out of the proper amount to be allowed as annual depreciation charge, and the elimination, by the commission, of certain items of operating expense claimed by the company as properly deductible. These may be itemized as follows:

Depreciation allowed by the commission........$1,800,000
Items disallowed under operating expenses:
    Reduction in taxes.......................$  750,000
    Reduction in new business expenses........   500,000
    Elimination of portion of rental charge......   200,000
    Elimination of payments to Hellier Coal Co.   22,963
    Elimination of donations.................    15,559
    Elimination of portion of expenses for main-
        tenance of mains.....................   130,000
    Elimination of portion of amortization of
        conversion expense...................   166,203

The discussion of these various items in the report of the master, and that of the commission, and in the briefs of counsel, is exceedingly voluminous and goes into the minutest detail, and it would serve no good purpose here to do more than consider the general features of each claim.

### DEPRECIATION.

The company claims it would require the setting aside of $2,892,311 for the year 1936 as a reserve for depreciation. This is the amount shown by the books and by the testimony of their expert witnesses as reasonable, and by the allowance of such sum in making their annual returns for income tax. The actual retirement as shown upon the books of the company for the year 1936 was $1,627,013. The evidence discloses all retirement figures from 1929 to

1936, inclusive, and during this period of time such retirements averaged $1,155,701 per year. The amount set aside for depreciation for such period averaged $2,720,762 per year, and the average excess of depreciation provision over retirements was $1,565,061 per year. This disparity is caused by a difference of opinion as to the life of the several structures of the company and the present percentage condition of the property of the company. The expert witnesses are in hopeless conflict as to the amount that should be set up in a depreciation reserve.

In *Lindheimer* v. *Illinois Bell Telephone Co. supra,* the court said: "Broadly speaking, depreciation is a loss not restored by current maintenance which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, inadequacy and obsolescence. Annual depreciation is the loss which takes place in a year. In determining reasonable rates for supplying public service it is proper to include in operating expenses, that is, in the cost of producing the service, an allowance for consumption of capital in order to maintain the integrity of the investment in the service rendered." In the case last mentioned, over a period of nine years, the actual retirements ranged from $11,990,000 to $15,828,000, but the depreciation reserve set up on the books during the same period ranges from $26,790,000 to $48,362,000. In discussing the point of the excessive amounts allowed for depreciation charges the court says: "We find this point to be a critical one. The questionable amounts annually charged to operating expenses and depreciation are large enough to destroy any basis for holding that it has been convincingly shown that the reduction in income through the rates in suit would produce confiscation."

The commission found the sum of $1,800,000 yearly, as sufficient to set up reserve for depreciation. This is criticized by the company as being without basis or foundation in the evidence. The entire financial history of the

company was before the commission. Officers of the company and expert witnesses were heard. The commission is presumed to be an expert body itself, and the fixing of the amount allowable for annual depreciation was entirely within its province, which we are not at liberty to disturb unless we find its action arbitrary or unreasonable. We do not think the commission has so offended, as a consideration of the entire record shows the amount allowed was within the range of the evidence on the question.

## TAXES.

For the year 1935, the company actually paid taxes amounting to $1,500,468 and withheld payment of taxes in the amount of $827,519. The latter action grew out of litigation concerning the valuation of the company's property. The exact rate for 1936 was not known when the commission filed its report, but later it appears that the rate for that year was $9.52 and the tax billed to the company consequently was $2,488,213. The witnesses tendered by the commission assumed that there would also be litigation concerning the 1936 taxes, and testified that $987,745 would be the same proportion of unpaid taxes for 1936, based upon the 1935 payments. The commission fixed this amount at $750,000, and consequently reduced the operating expenses of the company by that amount. This, of course, assumes that the company would either be successful in litigating the taxes, or would withhold this amount. We believe this position unsound. It is, of course, the privilege of any taxpayer to resist unwarranted taxes, but in order to litigate taxes it is necessary to deposit with the treasurer at least seventy-five per cent of the amount billed, and it may be that the company will elect not to litigate taxes and have the amount paid properly allowed as an operating expense. The action of the commission in this regard practically makes it necessary for the company to go into court and litigate taxes, but it does not furnish

them the money with which to make the cash payment of seventy-five per cent of the amount in controversy. Taxes are imposed upon a utility under authority of a public law, and it is an unreasonable action upon the part of the commission to arbitrarily assume, in advance of hearing, either that the utility should litigate its taxes, or that it will be successful if it does so. This is not a situation where the time of paying taxes is past and it is shown, as a matter of fact, that the expenditures have not been made, but this deduction is based upon the assumption of what will be done in the future. In this respect the act of the commission was erroneous, and the company should have been allowed, as an estimated operating expense, the entire amount of taxes billed against it on its property used or useful in the business.

### ELIMINATION OF EXPENSE FOR MAINTENANCE OF MAINS.

The evidence shows that for the year 1935, $466,350 was expended in the maintenance of the mains carrying gas. For the year 1936, the sum expended for like purpose was $680,929. In determining the operating expenses for the year 1936, the commission cut down the allowance for maintenance of mains to $550,000. This was a reduction of $130,000. The reason shown in the testimony for the large increase of maintenance expense of 1936 over 1935 was the extreme cold weather, and this, to our mind, seems a reasonable explanation, as it is not only more difficult to excavate deeply frozen ground but the amount of labor performed per dollar is also decreased. We think the commission was without authority to arbitrarily reduce an allowance shown to have been actually paid. We find no evidence that the company intentionally increased its maintenance expense or that it was any other than a *bona fide* expense. Where amounts of operating expenses are capable of definite proof, they may not be reduced by estimates of what the maintenance should have cost unless there is a further showing

that, for some reason, the amount was improperly increased over a legitimate cost. The action of the commission, in thus reducing the amount for maintenance of mains in the sum of $130,000 was erroneous.

### CONVERSION EXPENSE.

During the year 1931, the company spent $1,662,632 in adjusting gas burners of its customers to make them suitable for burning gas containing a higher amount of heat units. This expenditure was authorized by the commission, and was one that seems to be agreed to have been of an operating character. In 1932, the commission entered an order that the money thus spent for converting the burners should be amortized over a period of ten years, out of income, with the right upon the part of the company to, at any time, charge such sum to profit and loss. In order to raise the money, the company, with the consent of the commission, issued and sold securities which enabled it to do the work of conversion promptly, instead of spreading it over a period of time. We cannot see how authorizing the company to borrow the money to do an extensive operating service changes the character of the act. It was still an operating expense which the commission authorized to be extended over a period of ten years. The commission, when it excluded the amount of $166,263 from appellee's operating expense account, committed error, as it was a proper deduction from income for rate-making purposes.

### RENT.

The evidence shows that the company maintains its offices in a building in the downtown section of Chicago, owned by it but not included as a part of its property used for utility purposes. It occupies about thirteen floors of this building. The balance of the building is rented to other tenants. Excluding the basement and main floor, the company charged itself $2.88 per square foot a year,

and charged the other tenants in the building, for like space, at an average of $2.05 per square foot. The excess in amount of rent upon that portion of the building, comparable to other tenants, was $200,000 per year. This is another instance in the record in which concrete figures appear. The company owned the building and charged itself rent. It either charged itself too much to get the benefit of the profit of its non-utility property, or it charged the other tenants too little in order to fill the building, and thus make it a paying venture. This is another one of those matters that is exclusively within the jurisdiction and discretion of the commission. The building is not a public utility and the amount of its earnings is not an issue. If the company was willing to lease substantially the same kind of space to the general public at $2.05 per square foot, we see no good reason why the customers of the company should be required to pay $2.88 per square foot. In this respect, we think the action of the commission in reducing the operating expense account by the sum of $200,000 yearly for excessive rent, was correct.

### HELLIER COAL COMPANY EXPENSES.

Without comment, the commission eliminated from operating expense the sum of $22,963 for the year 1936, and $28,170 for the year 1937. It appears, from the evidence, that the commission, by order, approved the revised contract between the Peabody Coal Company and the company, and the contract between the company and the Hellier Coal Company which authorized these payments. There is nothing in the commission's finding concerning this item, except that the amounts should be excluded. If these contracts were made between the company and the coal companies and the amounts in question authorized to be paid, which does not appear to be disputed, it would seem that the commission's former order authorizing and approving the contracts would be sufficient justification for including

such amounts in operating expenses, and we, therefore, conclude that the commission was in error in so excluding them. The commission also eliminated from operating expenses the sum of $15,559 made as donations. The rule seems to be well settled that donations are not a proper operating expense unless it is shown that they will be of some peculiar benefit to the company or its patrons. (*Reno Power, Light and Water Co.* v. *Public Service Com.* 288 Fed. 790; *Denver Union Stock Yards* v. *United States,* 304 U. S. 470, 82 L. ed. 1469.) The commission did not err in excluding this amount from operating expenses.

### REDUCTION IN BUSINESS EXPENSE.

The remaining item excluded from operating expense by the commission is the sum of $500,000 in reduction of the new business expense. This item is discussed in considerable detail in both briefs and in the order of the commission. The total amount claimed by the appellee as expense of getting new business for the year 1936 was $1,519,945. Included in this item is a loss arising out of the sale of gas stoves and appliances. The company claims as new business expense not only an amount for sales promotion, but also an amount to retain sales, and that the loss on the sale of appliances and the expenses connected therewith, should be regarded as a part of such cost and allowed as an operating expense. One of the justifications for the expenditure of large sums in sales-retention expense grows out of the fact that an electric utility in the city is a competitor, and it is, therefore, called upon to take steps to prevent itself from losing business. The sales of appliances are claimed to have a direct connection with the sale of gas, as otherwise it is clear it would not be a proper expense of operation. A considerable part of this expense grew out of the method of selling gas heating appliances. Beginning in 1933, and continuing through 1935, the company had adopted a rental purchase plan for putting stoves

or appliances on the premises of customers. Under that plan, the customer was allowed a trial period before he became obligated to purchase the appliances. At the end of that time, he either purchased and paid the agreed price or returned the appliance without any cost to him. A large number of the appliances were returned and were charged off fifty per cent as used appliances. The total cost of the sales promotion business along this line was over $700,000. Since gas appliances are sold by many other dealers and those sales made by the gas company, if conducted as a separate business, would not be subject to regulation as a utility, the advisability of such a method of promoting sales of gas and of the propriety of the amount thus expended becomes a matter entirely for the commission. Ordinarily, in the absence of a showing of inefficiency or improvidence, the court will not substitute its judgment for the management's judgment in amount of outlay expended in procuring new business or in holding business already obtained, (*West Ohio Gas Co.* v. *Utility,* 294 U. S. 63, 79 L. ed. 761,) although the Supreme Court of the United States in *Denver Union Stock Yards* v. *United States, supra,* held that the same consideration should be given to the estimates of a company in such expenditures as it should to estimates of costs of other types of outlay.

It is manifest that after the customer has had the appliance for a year and turned it back and the charge is made upon the books for fifty per cent of the sales price as an operating expense, this opens the door to great latitude on the part of the utility, not only in engaging in competition in a line not regarded as a utility, but also in creating an unduly large expenditure for business promotion, to be charged as an operating account.

The evidence also shows that the sales of appliances were limited to the so-called upper class of people, where it did not run much chance of losing the appliance itself. It seems apparent that if the sales were confined to this

class of customers, in the very nature of things it could not prevent them from adopting other methods of heating if the competing utility was able to show the superiority of its product. It is impossible to say what measure of benefit a plan of this kind would have upon gas sales, and that is the only justification for which it is offered. As pointed out above, in 1936 the total new business expense exceeded $1,500,000, and the commission, for the same year, considered $500,000 of it as having been spent for business in reality non-useful to the company or to the consumers of the company's product. We believe the evidence shows the expenditures of the company in this respect were excessive when we consider that the appliance sales operations in 1935 cost $799,000, and for the year 1936, $371,000, including commercial expense consisting of salaries paid to salesmen of merchandise. A further fact weakening the claim of the company to the full allowance of these items is the proof that a large number of the sales of gas ranges were replacements of other gas ranges already used by the customer. This would not be a promotion of the sale of gas but of the sale of stoves. From 1922 to 1932, when the appliance department was operated separately from the utility, the new business expense averaged about $700,000 per year, but when it was taken over as a part of the utility, new business expense increased to over $1,500,000 per year. We do not think the action of the commission in this respect was unjustified, as, in the very nature of things, a sale of outside articles to promote the sales of a commodity regulated by a utility must be controlled by the commission, as otherwise it would be possible to either raise the operating expenses to unreasonable heights or convert the utility into a mere medium of selling appliances and merchandise not regulated by the commission.

The aggregate of the amounts that the commission improperly deducted from the operating expenses amounts to $1,069,226, which would, therefore, bring the proper amount

chargeable against income, including depreciation, up to $30,576,919, and leave a net income of $6,070,969, or slightly in excess of five per cent.

The findings of the master and the circuit court, upon the items just above discussed, were all in favor of the company and consequently we determine that the lower court's action in fixing the amount of depreciation, the amount of rent and the cost of new business, was erroneous. In determining the questions presented, not only on valuation of property, but also the amount allowable for depreciation and operating expenses, we have necessarily given considerable weight to amounts actually shown in evidence, because of the fact that the expert witnesses on both sides are in hopeless conflict, one side having a tendency to enhance values and costs and the other to decrease them. It appears that the commission, to a considerable extent, governed its action by what it could ascertain from actual costs and disregarded, to a considerable extent, the testimony of expert witnesses. In view of the conflicting mass of testimony we do not see how it could have done otherwise.

We will not attempt to analyze the question of earnings or deduction for the succeeding year, other than to say the net result obtained by each party was based upon estimates from previous years, and the results reached produce substantially the same results as for the year 1936.

### Fair Return.

This brings us to a consideration of the question of whether a net earning of five per cent justified the lower court in issuing an injunction. Had this been a proceeding to determine what a just and reasonable return would be, upon the valuation of the company's property, we would have had some doubt as to its adequacy. That, however, is not the issue here. The action of the commission, in refusing to install schedule No. 19, is not before this court since the action of the commission in fixing or refusing a

rate can only be tested in the manner prescribed by statute. The question presented in this record is whether a net return of five per cent constitutes confiscation or, in other words, deprives the company of its property without due process of law, and this is a different question than determining a just and reasonable return upon property used and useful in the utility business. It has been held that a reasonable rate is something other or higher than one not strictly confiscatory, the difference, if any, being determined with finality by the appointed officers of the State. (*Columbus Gas and Fuel Co.* v. *Public Utility, supra; Banton* v. *Belt Line Railway Co. supra.*) In *Public Utilities Com.* v. *Springfield G. & E. Co. supra,* this court said: "Generally speaking, a rate which is non-confiscatory would not be so unjust and unreasonable as would authorize setting aside the decision of the commission fixing such rate, * * * and yet there is a difference between a rate which is merely non-confiscatory and one which is just and reasonable, and it is the just and reasonable rate which the commission is called upon to fix." In a judicial proceeding the ultimate question presented is, "Is the rate sought to be enjoined, confiscatory?" (*Alexandria Water Co.* v. *Alexandria,* 163 Va. 512, 172 S. E. 454.) We have been unable to find any precise definition of what constitutes a rate that is confiscatory. It seems to us fair to assume that if the company could take a sum equivalent to the value of its property and invest it soundly, so as to insure a rate of return in excess of the return authorized by the commission, this would be proof, or at least evidence, of confiscation, yet we are bound to take judicial notice of the fact, as well as evidence in the record, that it would be exceedingly difficult to invest a sum anywhere comparable to the value of appellee's property so as to earn five per cent. It appears that in 1936 the yield of the highest grade public utility bonds was between three per cent and three and one-half per cent, and that between 1934 and 1936, first class public utilities

were enabled to borrow upon their bonds money at from three and one-fourth per cent to four and one-fourth per cent, and that the average yield on the best bonds of railroads and industries, during 1936 and 1937, ranged from three and one-fourth per cent to four and one-half per cent. It was also shown that State bonds and high grade city bonds were sold to yield anywhere from one and one-fourth per cent to two and one-half per cent. It also appears in the record that the company borrowed several million dollars for refunding purposes at four per cent. The fair rate of return is to be tested primarily by present day conditions. (*United Railways Co.* v. *West,* 280 U. S. 234, 74 L. ed. 390.) It seems reasonably clear that in view of present economic conditions, of which we take judicial notice (*Los Angeles Gas and Elec. Corp.* v. *Railroad Com. supra*) that the company would have great difficulty in realizing five per cent upon the money it has invested in its utility enterprise, in securities which would be as sound and as certain to return a like percentage. In this view it cannot be said that the company has suffered any loss of property that is confiscation. On the other hand, in ascertaining a just and reasonable return upon the investment there are other elements taken into consideration which include not only the earnings of other comparable companies, but also earnings that will enable the company at all times to be reasonably certain to become the purchaser of its stocks and bonds, so as to readily procure money for refunding or extension purposes. (*United Railways Co.* v. *West, supra.*) These elements are taken into consideration in fixing a just and fair return and doubtless the earnings of the company which the commission estimated at six per cent, took into consideration such factors.

As pointed out above, however, the order and finding of the Commerce Commission on schedule No. 19 was not further tested by an appeal, as authorized by the statute, but appellee was content to abide by the finding of the

lower court. Since we have no issue before us as to whether the return is just and reasonable, and only have determined whether the appellee established confiscation as alleged in the complaint, there is ample authority to sustain the proposition that under the present economic conditions a return of five per cent cannot be regarded as confiscatory.

In view of the foregoing, the decree of the circuit court of Cook county is reversed and the cause is remanded, with directions to dismiss the bill of complaint.

*Reversed and remanded, with directions.*

Mr. JUSTICE STONE, dissenting:

I cannot concur in the rule adopted in the majority opinion, which seems to preclude an equity court's independent determination of the evidence concerning the amounts allowable for depreciation and for loss. The majority opinion holds that the finding of the commission will not be set aside unless it is arbitrary or unreasonable or in clear violation of law, or unless it is clearly against the manifest weight of the evidence, citing *South Chicago Coal and Dock Co.* v. *Commerce Com.* 365 Ill. 218, and *Commerce Com.* v. *Chicago and Eastern Illinois Railway Co.* 332 id. 243. These cases were statutory appeals. The case before us is an appeal from a decree of the chancellor entered on a complaint in equity charging confiscation. In such a case a court of equity is empowered to, and in order to afford due process of law, must, determine such issues upon its own independent judgment as to both law and facts. *Ohio Water Co.* v. *Ben Avon Borrough,* 253 U. S. 287; *Oklahoma Operating Co.* v. *Love,* 252 id. 331; *Missouri* v. *Chicago, Burlington and Quincy Railroad Co.* 241 id. 553; *Missouri Pacific Railway Co.* v. *Tucker,* 230 id. 340.

This being so, the rule requiring that the findings of the chancellor on hearing or on approval of the report of the master in chancery shall not be disturbed upon review unless such findings are manifestly against the weight of the evidence, is to be applied. (*Smuk* v. *Hryniewiecki,* 369 Ill.

546.) Under such rule, I am of the opinion, from the evidence in this record, that the conclusions of this court on the above named issues are erroneous. Other courts have applied this rule to cases of this character. *Wichita Gas Co.* v. *Public Service Com.* 126 Kan. 220, 268 Pac. 111; *Mississippi Railroad Com.* v. *Mobile and Ohio Railroad Co.* 115 Miss. 101, 75 So. 778.

Mr. JUSTICE JONES, also dissenting.

Mr. JUSTICE FARTHING, specially concurring:

I cannot agree with the holding in this case that the trial court had jurisdiction, although I do agree as to the results reached on the merits. It was held in *Natural Gas Pipeline Co.* v. *Slattery,* 302 U. S. 300, that the Illinois statute with reference to utilities affords an adequate procedure and that there was no want of due process. This being true, on what basis could the company resort to the chancery court when it could have had adequate relief against its claim of confiscation through the administrative board and the procedure afforded by the act? Due process in rate cases does not mean that utility companies are entitled to instantaneous relief upon the filing of a rate or a petition to put the same into temporary effect.

In the case before us, the company had closed its proof and all of the evidence in the hearing on schedule No. 18 was before the commission when it filed its petition for an increased temporary rate. It had also introduced the testimony of additional witnesses. It cannot be said that it was denied a hearing. It made no effort to obtain a rehearing and it made no effort to appeal from the order denying its petition to put the new rate into effect until the conclusion of the whole matter involved in its application to put into effect schedule No. 19.

In addition to these facts, the amended and supplemental complaint was based on the final decision of the Illinois Commerce Commission permanently suspending schedule

72

No. 19, whereas the original complaint was based on the denial of the petition to put into temporary effect this same schedule. In order to have a cause of action, the company had to stand on the allegations of the complaint originally filed, and it could not avail itself of a cause of action that came into existence, if one ever did, after the original complaint in equity was filed.